612 So.2d 575 (1993)
Larry Joe JOHNSON, Sr., Petitioner,
v.
Harry K. SINGLETARY, Respondent.
No. 81121.
Supreme Court of Florida.
January 29, 1993.
*576 Steven L. Seliger, Quincy, and Larry Helm Spalding, Capital Collateral Representative, Martin J. McClain, Chief Asst. Capital Collateral Representative, and Gail E. Anderson, Asst. Capital Collateral Representative, Tallahassee, for petitioner.
Robert A. Butterworth, Atty. Gen. and Carolyn M. Snurkowski and Mark S. Menser, Asst. Attys. Gen., Tallahassee, for respondent.
PER CURIAM.
Larry Joe Johnson, a prisoner under sentence of death and the governor's death warrant, petitions this Court for writ of habeas corpus, extraordinary relief, a stay of execution, and oral argument. We have jurisdiction. Art. V, §§ 3(b)(1), (9), Fla. Const.
The facts of Johnson's crime and the procedural history of this case are recited in the prior opinions of this Court and the federal courts. Johnson v. Dugger, 932 F.2d 1360 (11th Cir.), cert. denied, ___ U.S. ___, 112 S.Ct. 427, 116 L.Ed.2d 446 (1991); Johnson v. Wainwright, 778 F.2d 623 (11th Cir.1985); cert. denied, 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed.2d 152 (1987); Johnson v. Dugger, 520 So.2d 565 (Fla. 1988); Johnson v. Wainwright, 463 So.2d 207 (Fla. 1985); Johnson v. State, 442 So.2d 185 (Fla. 1983) (direct appeal), cert. denied, 466 U.S. 963, 104 S.Ct. 2182, 80 L.Ed.2d 563 (1984).
Petitioner has raised only one issue meriting any discussion.[1] In Sochor v. Florida, ___ U.S. ___, 112 S.Ct. 2114, 119 L.Ed.2d 326 (1992), the United States Supreme Court held that
there is Eighth Amendment error when the sentencer weighs an "invalid" aggravating circumstance in reaching the ultimate decision to impose a death sentence.
___ U.S. at ___, 112 S.Ct. at 2119. Because the Florida penalty-phase jury is a co-sentencer under Florida law, id.; Espinosa v. Florida, ___ U.S. ___, ___, 112 S.Ct. 2926, 2928, 120 L.Ed.2d 854 (1992), the Eighth Amendment prohibition applies with equal vigor to what the jury actually weighs in its deliberations. However, since Florida juries do not issue findings as to aggravating and mitigating factors, the courts are required to presume that unsupported factors did not weigh with the jury, provided the jury was properly instructed. Put another way,
a jury is unlikely to disregard a theory flawed in law, [but] it is indeed likely to disregard an option simply unsupported by evidence.
Sochor, ___ U.S. at ___, 112 S.Ct. at 2122.
In Espinosa the Supreme Court held invalid a standard jury instruction on the aggravating factor of heinous, atrocious, or cruel. The improper instruction had defined the factor as "especially wicked, evil, atrocious or cruel." Espinosa, ___ U.S. at ___, 112 S.Ct. at 2927. Thus, under Sochor and Espinosa, an error would exist if the jury was instructed improperly on the heinous, atrocious or cruel *577 factor, whether or not the trial court in its written findings found the same factor to be present. Conversely, no error is present if the jury was properly instructed, even though the heinous, atrocious, or cruel factor could not have existed as a matter of law.[2]
Johnson contends that his penalty-phase jury was instructed contrary to the precepts of Espinosa and Sochor, in part because the trial court later found the heinous, atrocious, or cruel factor inapplicable here. We find that this claim is procedurally barred for Johnson's failure to object to the instruction based on vagueness or other constitutional defect.[3]Kennedy v. Singletary, 602 So.2d 1285 (Fla.), cert. denied, ___ U.S. ___, 113 S.Ct. 2, 120 L.Ed.2d 931 (1992).
Johnson also devotes some argument to the holding in Richmond v. Lewis, ___ U.S. ___, 113 S.Ct. 528, 121 L.Ed.2d 411 (1992), regarding the judicial adoption of narrowing constructions of aggravating factors. On this point, it is clear that Florida has adopted a narrowing construction of its heinous, atrocious, or cruel factor, e.g., Richardson v. State, 604 So.2d 1107, 1109 (Fla. 1992), that has tracked the language cited as acceptable in Sochor, ___ U.S. at ___, 112 S.Ct. at 2121. This is all that Richmond requires. We therefore will not presume to hold the narrowing language invalid at this juncture.
Finally, Johnson's petition mentioned the then-pending case of Lockhart v. Fretwell, ___ U.S. ___, 112 S.Ct. 1935, 118 L.Ed.2d 542 (1992) (granting certiorari), as a possible grounds for relief. We find that the recent opinion in Lockhart v. Fretwell, ___ U.S. ___, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993), provides no basis for relief.
For the foregoing reasons, we deny the motion that this case be set for oral argument and find that Johnson is entitled to none of the requested relief. The petition for habeas corpus is denied. No petition for rehearing will be entertained.
It is so ordered.
OVERTON, McDONALD, GRIMES and HARDING, JJ., concur.
BARKETT, C.J., concurs in result only with an opinion.
SHAW, J., concurs in result only.
KOGAN, J., concurs specially with an opinion, in which BARKETT, C.J., and SHAW, J., concur.
BARKETT, Chief Justice, concurring specially.
I concur with Justice Kogan's opinion. I would add, however, that relative to footnote 2 in the majority opinion, the law prohibits a judge from giving a jury instruction for which there is no evidentiary support.
KOGAN, Justice, specially concurring.
This case more than amply illustrates the problems inherent in applying procedural bars to death cases. When this death warrant is executed, Florida will electrocute a man injured and most probably maimed psychologically while serving in his nation's military in Vietnam and elsewhere. This will happen even though it is clear that, had this case been tried today, the procedures used in the trial court below would have been self-evidently defective. The court record in this case leads me to the disturbing conclusion that the legal system has failed to give Larry Joe Johnson even one particle of credit for his honorable service to his country or for the injury and disability he suffered while in the armed forces of the United States.
Prior to injuries he sustained while on military duty in 1974, Johnson was a man with a good military record of more than twelve years' duration, including stints in *578 the Navy and National Guard. People described him as bighearted and friendly despite being abandoned at birth by both parents and left to his grandmother's care. He was decorated during two tours of duty totaling some fifteen months in Vietnam. Johnson enlisted to serve in Vietnam, and he did so because he had admired the military all his life. His grandmother's home was next to a National Guard installation, where Johnson as a child had watched the men in arms, wanting to be like them. He fulfilled that dream.
One of the men assigned to Johnson's unit in the National Guard testified that, prior to the 1974 accident, Johnson was a good and friendly man who had risen to the rank of sergeant. He was liked by the men he commanded, and they were "tight" friends. Another National Guardsman who maintained personnel records said that, prior to the accident, Johnson
was very happy-go-lucky. He also believed in having a good time, kind of life of the party, a big cut-up and no pr[o]blems. He was an average run-of-the-mill person.
This same man said Johnson had no disciplinary problems on his military record and was "well liked" by the other men.
But after a freak head injury on military maneuvers in 1974,[4] Johnson descended into madness so severe he was hospitalized for ten months. He was ruled disabled, unable to continue his military service. After his later release from hospital and medical discharge from the military, Johnson could not control himself in the military manner he once had mastered. One psychologist said it was shameful that the military psychiatrists had failed to continue treatment of a man whose injury had transformed him into a "time bomb," a man who had even urged these psychiatrists to see that his own children be taken from him because he knew he could not control his temper any longer.
The threat was real. As time passed, Johnson's condition deteriorated still more. He became paranoid and argued with his wife and her brother. The latter fought back, and Johnson responded by carrying a gun at all times. In 1977, Johnson shot his wife. For this offense he served time for aggravated assault. The penalty in the present case was aggravated in part because of Johnson's probationary status and the fact that he had committed a prior violent felony. Ironically, these factors are most probably a result of Johnson's emotional collapse, for which he has been given no mitigating credit whatsoever.
There was psychological testimony at trial suggesting the reasons why Johnson lost control of his own mind. An expert in post-traumatic stress disorder[5] suffered by *579 Vietnam veterans indicated that the 1974 injury not only may have left some brain damage, but it also reawakened the night-marish experiences Johnson had endured in Vietnam.
One experience in particular had bothered Johnson tremendously: He had witnessed a close friend named Mack drive a truck over a Vietnamese land mine, which exploded. Almost nothing identifiable was left of Mack's body, but Johnson had run forward to try to help. Johnson had searched through the debris and couldn't understand why he could not find Mack. On other occasions in Vietnam, Johnson had a bulldozer blown out from under him; he was held at gunpoint by two Vietnamese; and he witnessed a Vietnamese stab a friend standing next to him.
This same expert witness testified that, at the time of the murder, Johnson was under extreme emotional disturbance directly related to post-traumatic stress disorder. This witness made the following observations of the psychiatric treatment Johnson received in the military psychiatric units:
[Johnson was a] walking time bomb. When I read over the material of the psychiatrist, the three psychiatrists that evaluated him following the [1974] accident, I was somewhat ashamed. Ashamed that the Army psychiatrists were not able to see the potential violence. All the signs were there. They even diagnosed traumic neurosis. They cited his statement as saying I wanted my kids to go with grandmother, I was afraid I was going to kill them. When he shot his wife, it was almost the identical kind of situation. I don't understand why they didn't do something themselves rather than exposing him to the general public. So yes, the signs were there clearly.
This same witness also testified that Vietnam veteran's post-traumatic stress disorder is most common in veterans who don't have, or who lose, their "coping" system. Poor coping skills are associated both with an unstable family background, and a lack of a support system in the present-day. Johnson had both: His parents abandoned him, and he lost his adult support system  the military  once his injuries rendered him unable to serve his country.
In the years that followed the accident, Johnson suffered recurring headaches, dizziness, nausea, fainting spells, nightmares, and irrational behavior. Relatives testified they had seen him simply fall over on his face on occasion, in a dead faint. He sometimes awoke screaming in the middle of the night about people trying to shoot him. He was often despondent and short-tempered and spoke of his desire, now rendered impossible, to return to the military career that had been the high point of his life.
An aunt and uncle cared for Johnson after his injury and believed him to be seriously mentally ill. Partly through their prodding, he was treated in at least two military psychiatric units in the years that followed, including additional periods of hospitalization. Once he was hospitalized for a three-week period, then decided he wanted to leave and checked himself out.
The treatments did not help. Prior to Johnson shooting his own wife, his family and others had contacted county officials, including the sheriff, asking them to intervene to stop Johnson's crazy behavior. But they were told nothing could be done "till he hurt somebody." At one point a judge, at the insistence of Johnson's sister, ordered him committed briefly. Other commitment efforts failed.
One expert who had conducted ten hours of testing on Johnson concluded that he had brain damage that was chronic and long-standing, possibly beginning at birth, exacerbated by two head injuries received in Vietnam and the third head injury sustained in the 1974 accident. The brain *580 damage contributed to his inability to cope, the expert said.
This expert also stated that Johnson has a low IQ in the 70s and suffers from anxiety. He was judged to be emotionally immature  at the adolescent level or lower  with a tendency to lose control under stress. In one test he was unable to reproduce the alphabet, and his ability to understand spoken language fell in the bottom one percent. This expert stated that Johnson was under extreme emotional distress when he pulled the trigger.
There was evidence indicating that Johnson, at the time of the murder, believed the store attendant was about to pull a gun on him. The post-traumatic stress expert stated that, in such a situation, a traumatized Vietnam veteran tends to react much the same way he did in Vietnam. To this extent the expert believed that Johnson lacked the ability to conform his conduct to the requirements of the law.
It is true that the State introduced its own two psychiatrists as experts. Their testimony tended to refute some, but by no means all or even most, of the mitigating evidence submitted by Johnson. Both psychiatrists said they felt there was no direct connection between Johnson's injuries, his experiences in Vietnam, and the murder. They felt his intelligence was average and that he did not suffer delusions or hallucinations.
However, they drew these conclusions from a single hour-and-a-half interview at which both psychiatrists were present. These psychiatrists also did not indicate whether Johnson was suffering from an emotional disorder that could have contributed to violent behavior; nor did they rule out whether any such disorder was caused or exacerbated by Johnson's head injuries and other traumas suffered while in military service.
Moreover, one of the State's experts made several telling remarks. He noted that on the day of the interview Johnson was taking prescription medications to control epileptic seizures and anxiety. He also recorded Johnson's statement that, between 1964 and 1977, Johnson had visited psychiatric clinics continuously to be treated for battle fatigue and shell shock. During this period, Johnson said he was taking prescription antidepressants, analgesics, tranquilizers, and medication to control epileptic seizures. The psychiatrist also noted that Johnson said he was on anti-epilepsy and anti-anxiety medication on the day of the murder, but that this would not necessarily have affected Johnson's judgment if the pills were taken in normal quantities.
Other witnesses testified that Johnson was taking "a lot of pills" after the 1974 accident.
Even though some of the mitigating testimony recounted here may have been refuted by the State, clearly most was not. Accordingly, I can find no justification for this Court's prior decision to affirm the trial court's finding that no mitigating evidence existed. That finding is simply insupportable under any fair reading of the record. See Parker v. Dugger, 498 U.S. 308, 111 S.Ct. 731, 112 L.Ed.2d 812 (1991) (appellate findings not supported by trial record should be discounted). On appeal, this Court merely quoted extensively from the trial court's sentencing order, then approved it with little comment or analysis. This occurred despite the extensive case for mitigation, as outlined above. See Johnson v. State, 442 So.2d 185 (Fla. 1983), cert. denied, 466 U.S. 963, 104 S.Ct. 2182, 80 L.Ed.2d 563 (1984).
I recognize the procedural bar raised by the large number of collateral challenges Johnson has brought through the years. However, I write to express my belief that the procedural bar now is being applied to require the execution of a man who has not been given proper credit for the good that he has done and the bad that he has suffered while in service to his nation in Vietnam and elsewhere. This is a man who devoted his adult life to the defense of his nation, who then was abandoned without the medical intervention he obviously needed after being injured while on his nation's business.
It is clear to me that, if this trial were conducted today, we would not permit the trial court nor ourselves to ignore the vast *581 and largely unrebutted case for mitigation developed in this trial. See, e.g., Campbell v. State, 571 So.2d 415 (Fla. 1990). It may well be that the death penalty might have been imposed even if proper procedures were followed, but I cannot so conclude with any degree of certainty. The case for mitigation here is one of the strongest I have seen; and the case for aggravation was significantly weakened by the fact that Johnson's prior violent behavior and subsequent incarceration most probably were exacerbated by his physical and mental injuries.
I am gravely disturbed that Johnson was not even permitted the tiniest mitigating value for his physical and mental disabilities, nor for the one thing that caused them: his years of good and productive service in the military. I also question whether the aggravating factor of witness elimination was properly found by the trial court, because I cannot find in this record proof beyond a reasonable doubt that the predominant motive of the killing was witness elimination, as our law requires. Menendez v. State, 368 So.2d 1278, 1282 (Fla. 1979).
To my mind, this is a case in which a thumb was pressed firmly on death's side of the scale during Johnson's penalty phase proceeding. See Sochor v. Florida, ___ U.S. ___, ___, 112 S.Ct. 2114, 2119, 119 L.Ed.2d 326 (1992); Stringer v. Black, ___ U.S. ___, ___, 112 S.Ct. 1130, 1137, 117 L.Ed.2d 326 (1992). This conclusion is compounded by a jury instruction on heinous, atrocious, or cruel that appears to nearly match the same language found unconstitutional in Shell v. Mississippi, 498 U.S. 1, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990). If this case with its manifold errors were before me on direct appeal, I would vote at a minimum to remand for a new penalty phase, as did Justices McDonald and Overton in the initial appeal.[6]Johnson, 442 So.2d at 191 (McDonald, J., dissenting, joined by Overton, J.). I also question whether death is a proportionate penalty here in light of intervening cases such as Fitzpatrick v. State, 527 So.2d 809 (Fla. 1988) (death not warranted for defendant suffering serious psychological disorder not amounting to insanity that contributed to murder).[7]
I concur only because the procedural bar is the law of Florida, which I am sworn to honor.
BARKETT, C.J., and SHAW, J., concur.
NOTES
[1] The other issues raised are unquestionably procedurally barred. They are: (1) that Florida's statute setting forth aggravating factors is unconstitutionally vague; (2) that the jury's recommendation was tainted by the consideration of other invalid aggravating factors, including the "witness elimination" factor; and (3) that Johnson's penalty was automatically aggravated in violation of the Constitution.
[2] Of course, we do not hold that trial courts are required to instruct on every aggravating factor. The trial court has discretion not to instruct on factors clearly unsupported by any evidence, and there may be some cases in which it would be inappropriate to do so.
[3] Johnson argued only that the factor of heinous, atrocious, or cruel was not supported by the evidence and therefore that the jury should be instructed that it did not exist.
[4] Johnson was struck directly in the head by a smoke grenade canister hurled in his direction. The canister weighed some four or five pounds, and it caused profuse bleeding, Johnson's immediate hospitalization, and the eventual diagnosis of a thirty-percent medical disability. Johnson's emotional problems began during his convalescence from this injury.
[5] Post-traumatic stress disorder is a subcategory of anxiety disorders recognized in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (3d ed. 1980), which sets forth objective standards for diagnosing mental disease. One of its common features is delayed onset after the stressful situation has ended, usually when some triggering event occurs that is reminiscent of the stressful situation. The trigger can be as benign as the sound of a helicopter, for example, since helicopters were commonly used in Vietnam. An estimated one million Vietnam veterans suffer some form of the disorder. Daniel E. Speir, Application and Use of Post-Traumatic Stress Disorder as a Defense to Criminal Conduct, Army Law., June 1989, at 17, 17. Symptoms can include loss of interest in the outside world, withdrawal or estrangement, hyperalertness, sleep disturbances, guilt, memory impairment, depression, anxiety, and unpredictable explosions of aggressive or impulsive behavior often involving sudden trips, unexplained absenses, or changes of lifestyle. Michael J. Davidson, Post-Traumatic Stress Disorder: A Controversial Defense for Veterans of a Controversial War, 29 Wm. & Mary L.Rev. 415, 421-22 (1988). The murder committed by Johnson fits within the last part of this description: It involved an impulsive trip to Florida from his home in Kentucky with a minor girl who ran away from home to join him. While in Florida, Johnson (again on impulse) decided to travel to Minnesota. He and the girl stopped at a roadside store in Lee, Florida, while traveling on Interstate 10. Johnson sent the girl in to buy cigarettes for him, but then unexpectedly entered moments later carrying a sawed-off shotgun. After Johnson ordered the attendant to hand over all his cash, the girl took the money and turned to leave. Looking back, she saw Johnson shoot the attendant. Johnson later told the girl the attendant had pulled a gun. The pair then went, not to Minnesota, but back to Kentucky. At this point, the girl told her mother what had happened, and the mother contacted police. The girl was the State's primary witness against Johnson. No charges were brought against her.
[6] Johnson's trial occurred in 1979. Florida death-penalty law has evolved considerably since that time in several respects directly relevant to this case. Most importantly, it is now clear that today at least the trial court would have had no discretion to out-and-out reject the vast case for mitigation presented by Johnson, but instead would have been forced to find a variety of mitigating factors and expressly weigh them against the aggravating factors. See, e.g., Campbell v. State, 571 So.2d 415 (Fla. 1990). These mitigating factors include Johnson's serious emotional disorders and emotional trauma resulting from service in Vietnam, the failure of military psychiatrists to give Johnson the treatment he needed despite diagnosing him as seriously ill, his head injuries suffered during military service that resulted in a diagnosed medical disability, the fact he was a decorated Vietnam veteran and had a good record while in service to his country, his epilepsy and other debilitating physical ailments including brain damage, his low IQ and emotional immaturity, and the fact that he rose above a deprived childhood to become a good and productive citizen until the time he was injured in 1974. In addition, the Court now has established a category of offenses resulting from serious mental disturbance not amounting to insanity for which the death penalty is impermissible based on the doctrine of proportionality. Fitzpatrick v. State, 527 So.2d 809 (Fla. 1988). Johnson's case may well fall within that category. See also Tillman v. State, 591 So.2d 167 (Fla. 1991).
[7] Johnson has not raised the issue of proportionality premised on intervening cases, so I mention the point only by way of illustrating my deep concerns about this case. See Tillman v. State, 591 So.2d 167 (Fla. 1991) (death penalty improper if imposed based on facts similar to cases in which death was deemed improper).