618 So.2d 165 (1993)
Raymond PADILLA, Appellant,
v.
STATE of Florida, Appellee.
No. 76493.
Supreme Court of Florida.
March 25, 1993.
Rehearing Denied June 1, 1993.
*166 Scott W. Sakin, Miami, for appellant.
Robert A. Butterworth, Atty. Gen. and Anita J. Gay, Asst. Atty. Gen., Miami, for appellee.
PER CURIAM.
Raymond Padilla appeals his convictions of first-degree murder and attempted first-degree murder and the trial court's imposition of the death penalty in accordance with the jury recommendation, as well as his departure sentence for the attempted first-degree murder. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. We affirm Padilla's convictions but remand this cause for new sentencing proceedings.
The relevant facts reflect that, in the latter part of 1988 and the early part of 1989, Padilla had a relationship with Marisella Davila and that they briefly lived together in her apartment. The relationship ended when she asked him to move out of the apartment. At approximately noon on February 10, 1989, the day of the murder, Padilla gave a Mr. Rodriguez a .38 caliber gun as collateral for a loan. On that same date, Marisella moved out of the apartment she and Padilla had occupied and into a new apartment, completing the move at about five o'clock in the afternoon. Around 6:00 or 6:30 that evening, Padilla was at work when Hector Davila and Paul Gomez, Marisella's son and nephew, respectively, asked Padilla to come outside. Padilla stated that Paul held a gun on him while Hector beat him. Rodriguez testified that around dinner-time Padilla appeared at his house, bleeding from his head and hand, and explained that Hector and Paul had beat him up. Padilla asked Rodriguez for and obtained the return of the gun that Padilla had given him as collateral. Rodriguez told him to be careful and Padilla replied, "A man has got to do what a man has got to do." Approximately thirty minutes later, Padilla returned to Rodriguez's home and asked Rodriguez for more ammunition. Rodriguez asked Padilla what he had done with the other bullets, to which Padilla responded that he had "wasted" them. Rodriguez then gave him three bullets from another gun. Marisella testified that, upon returning to her old apartment the day after this incident, she observed holes in the window that had not been there the day before.
Eyewitnesses to the murder testified that, in the early evening of February 10, they saw Padilla at Marisella's new apartment. The witnesses testified that, as Paul returned from the dumpster to Marisella's new apartment, Padilla pulled a gun from his waistband, stated, "Yeah, motherfucker, I've got you now," and shot Paul once in the back of the head. Paul fell to the ground face down. The eyewitnesses testified that, when Marisella opened the door, Padilla shot at her. Marisella testified that, when she heard the shots, she went to the front door, opened it, and saw Padilla standing outside pointing a gun directly at her. She stated that, after closing the door, she felt something pull her backwards. She then noticed blood on herself and realized that she had been shot.
Rodriguez testified that, about a half hour after he gave Padilla the additional bullets, Padilla came back to Rodriguez's house and stated that he had "shot them" and that he needed a ride to his house. Rodriguez drove Padilla to pick up his wife and children and then to a friend's house.
The next day, Padilla was arrested for first-degree murder. After being advised of his rights, he admitted the shooting, explaining that he had been beaten up and went back to get revenge. He confessed to firing one shot at Paul and stated that, upon seeing the apartment door open, he thought that Hector was coming out and fired two shots into the apartment. Padilla stated that he then left the scene and threw the gun into a canal.
The medical examiner testified that Paul died as a result of a single gunshot wound through the back of his head. The examiner further stated that the single gunshot wound instantly incapacitated Paul. A firearms expert testified that the bullets recovered from Marisella's prior apartment, *167 the bullet from Paul's body, and the bullet found in the living room wall of Marisella's new apartment were all fired from a .38 special revolver and all were very consistent. Padilla presented no evidence in the guilt phase of the trial and was found guilty as charged by the jury.
At the penalty phase, the State presented two witnesses. The first was a New York parole officer assigned to monitor Padilla's parole. Padilla had been sentenced to serve twenty years for first-degree manslaughter and had been paroled on June 27, 1986, with his parole obligation to expire on October 26, 1994. There was no dispute that Padilla had pleaded guilty to manslaughter in New York and had been sentenced as stated above.
The State next presented a homicide detective who presented evidence concerning the circumstances of the incident that led to the manslaughter plea. This detective stated that Padilla had given him a statement of how the victim died in the New York incident. In that statement, Padilla stated that he had been invited to have a beer in the victim's apartment and that, when the victim took off his pants and came toward him, Padilla hit the victim in the chest and face. The detective testified that, when the victim fell unconscious into the bathtub full of water, Padilla began to look around for valuable items to take. After finding a ring, camera, chain, and television set, Padilla observed the victim trying to get up. Padilla then pushed the victim's head underwater. A short time later, Padilla saw the victim lying on his side and again held his head underwater. Evidence was then presented that Padilla was initially charged with second-degree murder but entered a plea to manslaughter.
The defense presented testimony from Padilla's sister, who testified that their father was a violent man who kicked and punched her brother three or four times a week when they were young. She testified that Padilla was frequently beaten with an electrical cord or a belt by their parents. She further testified that her brother had mental health problems, explaining that he had received electric shock therapy at the age of ten and had been placed in a mental institution in Cleveland, Ohio, at the age of thirteen. On cross-examination, the prosecutor asked the sister, "And are you aware of the fact that your brother Raymond Padilla, beat his wife?" Defense counsel objected and moved for a mistrial. The trial court denied the motion for mistrial but warned the prosecutor about introducing this type of evidence.
The defense also presented the expert testimony of Dr. Jethro Toomer, a psychologist, who concluded that Padilla suffered from a borderline personality disorder that had formed during Padilla's childhood. Dr. Toomer stated that, in his opinion, Padilla could not appreciate the criminality of his conduct and could not conform his conduct to the requirements of law. He testified concerning Padilla's history of psychological problems, the electric shock therapy and doses of thorazine Padilla had received, and the fact that Padilla had been physically abused as a child.
Padilla then testified on his own behalf, corroborating that, as a child, he had been beaten a great deal by his father and that he had been hospitalized as a result of one of these beatings. Padilla also stated that he had liked Paul and that his problems with Paul did not start until after his relationship with Marisella came to an end. Padilla stated that, after that point, Paul and his relatives threatened him with weapons on several occasions. Padilla also stated that he now realizes that he should not have gone after Paul with a gun and that he regretted shooting Paul. The jury recommended that the death penalty be imposed by a vote of nine to three.
During jury selection, the defense moved to strike for cause two jurors who expressed concern with the concept that Padilla might not testify. After substantial inquiry by defense counsel concerning a defendant's right to not speak in his defense, the trial judge asked Juror W. whether he could follow the court's instructions on Padilla's right to remain silent in the following manner:

*168 I have got to get this straight here so I have it straight in my mind. If I give you an instruction and tell you the State has the burden of proof and the Defendant has to say nothing whatsoever, you will not hold it against him even if you would like to, you can't, or even if I told you you could not discuss it, not even in the jury room, would you be able to follow my instructions?
MR. W.: Yes.
Padilla moved to strike Juror W. for cause, and the trial judge denied the motion. At that time, Padilla had two peremptory challenges remaining. Padilla did not use one of those challenges to dismiss Juror W. and later accepted him.
Defense counsel also extensively questioned Juror N. The trial judge again asked the following questions of the juror at the end of defense counsel's inquiry:
[DEFENSE COUNSEL]: Could you follow the definition of the law as explained to you by the Judge?
MS. N.: I will follow the law, yes.
THE COURT: ... . I understand what you just said. However, if I instruct you that the State has the burden of proof and the Defendant need not say anything, would you hold it against him? Could you disregard those feelings that you have and could find him not guilty?
MS. N: If the State doesn't meet its burden, even if he chooses not to defend himself  if they could not satisfy me of his guilt, is that what you are saying?
THE COURT: Well, not satisfy your standards. If I instruct you  if I give you an instruction that you cannot find him guilty, that the State has not proven their case, would you still find him guilty?
MS. N.: No.
THE COURT: Even though you will not hear from the Defendant, could you still follow my instructions and follow the guidelines, even though you do not know what the guidelines are right now, could you still follow them?
MS. N.: Are you asking me on a hypothetical basis?
THE COURT: Well, not hypothetical. You will be given a definition on reasonable doubt and on burden of proof, and if the State hasn't convinced you beyond a reasonable doubt that the Defendant did commit this crime, then you must find him not guilty. Could you go along with that?
MS. N.: I would find him not guilty.
The defense moved to strike Juror N. for cause. The trial judge denied the motion and the defense then exercised a peremptory challenge to remove Juror N. After Padilla had exercised all of his peremptory challenges, he asked for additional peremptory challenges but never identified Juror W. or Juror N. as objectionable and as grounds for the additional challenges.
At the sentencing hearing before the judge, supplemental evidence was presented by a psychologist who had examined Padilla. The psychologist testified that Padilla had a long-standing drug and alcohol abuse problem that was the result of using crack cocaine and LSD and inhaling spot remover.
The trial judge, in imposing the death penalty, found the following three aggravating factors:
1. The murder was committed by a person under sentence of imprisonment.
2. The defendant was previously convicted of another capital felony or of a felony involving the use of, or threat of, violence to the person.
3. The murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification.
The court found one mitigating factor: "The murder was committed while the defendant was under the influence of extreme mental or emotional disturbance." The trial judge determined that the death sentence was appropriate in this case, concluding that there were "sufficient aggravating circumstances to justify the sentence of death which outweigh any mitigating circumstance that may be present."

*169 Guilt Phase

In the guilt phase of this appeal, Padilla claims that the trial court erred in: (1) denying Padilla's challenge for cause made at trial against prospective jurors W. and N., asserting that a reasonable doubt was established concerning these jurors' ability to render an impartial verdict; (2) denying Padilla's motion for mistrial made in response to the State's introduction of evidence of collateral criminal activity, specifically, the firing of shots into Marisella's former apartment; and (3) refusing defense counsel's request to instruct the jury on how to consider this collateral crime evidence. We find all of these claims to be without merit.
With regard to the first claim, Padilla argues that, during voir dire, both Juror W. and Juror N. indicated that they had a problem with the concept that Padilla might not testify in his own defense. After extensive inquiry, defense counsel moved to strike both jurors for cause. The trial judge, as previously set forth in this opinion, expressly asked both jurors whether they would be able to follow the court's instructions, particularly asking if they could follow the law and not hold Padilla's silence against him. We note that defense counsel did not exercise a peremptory challenge on Juror W., even though he had two peremptory challenges remaining when his motion to strike Juror W. for cause was denied. Further, defense counsel did not specifically identify Juror W. or Juror N. as objectionable when he asked the court for additional peremptory challenges. Padilla contends that W.'s and N.'s unequivocal indications that they could base their verdict on the law did not remove the substantial doubts established during voir dire concerning their ability to be impartial. We reject that argument and find that the trial judge, under these circumstances, did not abuse his discretion in denying defense challenges for cause. Pentecost v. State, 545 So.2d 861 (Fla. 1989); Cook v. State, 542 So.2d 964 (Fla. 1989); Lusk v. State, 446 So.2d 1038 (Fla.), cert. denied, 469 U.S. 873, 105 S.Ct. 229, 83 L.Ed.2d 158 (1984).
In his second claim, Padilla asserts that the trial court erroneously allowed the State to present evidence that Padilla fired several shots at Marisella's former apartment. We find that the evidence was admissible as "inseparable crime evidence." See Tumulty v. State, 489 So.2d 150, 153 (Fla. 4th DCA), review denied, 496 So.2d 144 (Fla. 1986). We also find that the evidence presented was clearly relevant to establish Padilla's mental condition during the course of this incident, which necessarily includes the initial obtaining of the firearm and then the return in less than an hour to obtain more bullets. This evidence was relevant for the State to establish Padilla's mental state in order to prove premeditation. See Jackson v. State, 522 So.2d 802 (Fla.), cert. denied, 488 U.S. 871, 109 S.Ct. 183, 102 L.Ed.2d 153 (1988); Gorham v. State, 454 So.2d 556 (Fla. 1984), cert. denied, 469 U.S. 1181, 105 S.Ct. 941, 83 L.Ed.2d 953 (1985).
Padilla's third claim is related to the second because he contends that the trial court erred in refusing to instruct the jury on how to consider this collateral evidence. We find that no instruction was necessary and that the evidence was properly admitted under section 90.402, Florida Statutes (1989).

Penalty Phase
Padilla raises five claims in the penalty phase of this appeal.[1] Because we find that this cause must be remanded for a new sentencing proceeding, only three claims merit discussion.
*170 We first address Padilla's contention that the trial court erroneously found that the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification. In its closing argument, the State argued that the murder had been committed in a cold, calculated, and premeditated manner. The trial judge instructed the jury on this aggravating factor and, in finding that it applied, stated:
According to testimony at trial the defendant was beaten at his place of employment. He then acquired a weapon and bullets from someone he had left the gun with as collateral for a loan. He apparently went to a former apartment of the victim of the attempted first-degree murder and expended the bullets. He then went back and borrowed more bullets, went to the new apartment and proceeded to commit the first-degree murder and attempted first-degree murder. The Court finds the aggravating circumstance was proven.
Padilla asserts that this was not a prearranged or execution-style killing but was more a case of a spontaneous act that resulted from Padilla's fear of Hector and Paul. Padilla also claims that the State failed to prove that this was done without any pretense of moral or legal justification since it is clear that Padilla knew Paul to be a violent person, who had threatened him and assisted Hector in beating him up. The State, on the other hand, claims that this was a preplanned killing  not an impulsive one. We conclude that the cold and calculated factor does not apply under these circumstances. The finding of the trial court itself supports the assertion that this murder was more of a spontaneous act, resulting from Padilla's being beaten, than a preplanned act that was done with cold deliberation. In our view, the nature of the event does not establish the necessary elements to establish this aggravating factor. Because we find that this was a significant aggravating factor in the imposition of the death sentence, and its elimination reduces the number of aggravating factors to two, with one mitigating factor, we find that it is necessary to remand this cause for a new sentencing proceeding before a new jury.
Since the penalty phase of this matter will be retried, we find it appropriate to address Padilla's claim that the State should not have been allowed to present testimony and evidence regarding the details of the incident in New York that led to his pleading guilty to manslaughter. We have previously held that the State may present testimony during the penalty phase of a capital trial that establishes that the prior crime for which a defendant was convicted was a violent felony. See Rhodes v. State, 547 So.2d 1201 (Fla. 1989); Tompkins v. State, 502 So.2d 415 (Fla. 1986), cert. denied, 483 U.S. 1033, 107 S.Ct. 3277, 97 L.Ed.2d 781 (1987); Mann v. State, 453 So.2d 784 (Fla. 1984), cert. denied, 469 U.S. 1181, 105 S.Ct. 940, 83 L.Ed.2d 953 (1985). Evidence of the indictment, the conviction, and the defendant's confession may be presented to establish this point. It is significant in this case that almost all of the substantive facts concerning this manslaughter incident came from Padilla's confession in that case.
Finally, we must agree with Padilla that the trial judge erred by not stating in writing his reasons for departing from the guideline sentence of seventeen-to-twentytwo years and imposing a twenty-seven-year sentence for the attempted first-degree murder. The law is clear that the sentencing judge must set forth his departure reasons in writing at the time of sentencing and, while we find that the judge could have validly departed from the recommended guideline sentence based on the first-degree murder conviction, the law does not allow the trial judge to submit those reasons in writing after the sentence has been imposed. Our prior opinions on this issue mandate this result. Smith v. State, 598 So.2d 1063 (Fla. 1992); Pope v. State, 561 So.2d 554 (Fla. 1990).
For the reasons expressed, we affirm Padilla's convictions for first-degree murder and attempted first-degree murder. However, we vacate the imposition of the death sentence for first-degree murder and the departure sentence for attempted first-degree *171 murder and remand this cause for (1) a new penalty phase proceeding before a new jury for the first-degree murder conviction and (2) the imposition of a sentence within the guidelines for the attempted first-degree murder conviction.
It is so ordered.
BARKETT, C.J., and OVERTON, McDONALD, SHAW, KOGAN and HARDING, JJ., concur.
GRIMES, J., concurs in part and dissents in part with an opinion.
GRIMES, Judge, concurring in part, dissenting in part.
The Court has properly decided that there was insufficient evidence to support the finding that the murder was committed in a cold, calculated, and premeditated manner, and we are remanding for resentencing because we are unable to conclude that the elimination of this aggravating factor was harmless beyond a reasonable doubt. Under these circumstances, however, there should only be a resentencing before the trial judge rather than empaneling a jury for a new sentencing proceeding.
In Johnson v. Singletary, 612 So.2d 575 (Fla. 1993), the petitioner argued that the death sentence was flawed because the jury had been instructed on aggravating circumstances which were not later found. We rejected this argument based upon the rationale of Sochor v. Florida, ___ U.S. ___, 112 S.Ct. 2114, 119 L.Ed.2d 326 (1992). Thus, in Johnson we stated:
[S]ince Florida juries do not issue findings as to aggravating and mitigating factors, the courts are required to presume that unsupported factors did not weigh with the jury, provided the jury was properly instructed. Put another way,
a jury is unlikely to disregard a theory flawed in law, [but] it is indeed likely to disregard an option simply unsupported by evidence.

Sochor, ___ U.S. at ___, 112 S.Ct. at 2122.
612 So.2d at 576.
Because Padilla's jury was properly instructed on the cold, calculated, and premeditated factor, we must presume that the jury properly applied the law. The error in this case was committed by the trial judge in finding the existence of this factor. Therefore, we should remand the case only to the trial judge for a reweighing of the remaining valid aggravating and mitigating factors.
NOTES
[1] Padilla asserts that the trial court erred: (1) by allowing the State to introduce evidence of nonstatutory aggravating circumstances of prior conduct for which Padilla was neither charged nor convicted; (2) by not finding as a mitigating circumstance that Padilla could not appreciate the criminality of his conduct or conform it to the requirements of the law; (3) by finding that the homicide was committed in a cold, calculated, and premeditated manner; (4) by failing to expressly evaluate in writing each mitigating circumstance proposed by Padilla; and (5) by sentencing Padilla for attempted first-degree murder above the guideline range without stating the court's reasons for such a departure sentence.