PER CURIAM.
Justin Curtis Heyne appeals his convictions for the first-degree murders of Benjamin Hamilton, Sarah Buekoski, and Ivory Hamilton, and his sentence of death for the murder of Ivory.[1] For the reasons stated below, we affirm his convictions and sentence.
I. BACKGROUND
On March 80, 2006, Sarah Buekoski returned to her home with her five-year-old daughter, Ivory Hamilton, to find Heyne and Ivory’s father, Benjamin Hamilton, engaged in a verbal dispute. The dispute centered on money Heyne owed to Benjamin and took place in the master bedroom, a 12-by 13-foot room in which law enforcement later discovered drug paraphernalia and several pounds of marijuana. Heyne worked with Benjamin and was temporarily residing with Benjamin, Sarah, and Ivory in Titusville, Florida. Heyne was 24 years old. Benjamin and Sarah were 26 and 24, respectively.
As the argument escalated, Heyne began to feel disrespected. He started to walk away when he heard Benjamin cock a 9-mm gun. Heyne left, retrieved a .38 Special from his room, and then returned to the master bedroom to continue the argument with Benjamin. The two argued while holding their respective guns but did not point them at one another while arguing. Heyne pushed Benjamin onto the bed. At some point during the dispute, *118 Ivory entered the room, prompting Benjamin to drop the 9-mm. Heyne picked up Benjamin’s 9-mm. Benjamin told Ivory to leave the room, and she turned to walk out.
In its sentencing order, the trial court detailed the shootings as follows:
Benjamin Hamilton was shot at a distance of no more than four or five feet. At that point, Sarah Buckoski dove to the floor on the far side of the bed near the wall and started screaming. The defendant shot her next. She was shot one time, but the bullet passed through her arm before it entered the center of the back of the head. At that point, Ivory began to pull on the defendant’s shorts and the defendant shot her one time in the head at point blank range.
When law enforcement arrived on the scene, Benjamin was struggling for air on the bed, Sarah was on the floor next to the bed in a fetal position screaming, and Ivory was lying on the floor without a pulse. An autopsy revealed that just prior her death, Ivory was slapped in the face in a manner violent enough to cause a rupture of the blood vessel beneath the skin. A bullet fired from Heyne’s .38 Special was found in her skull.
After the shooting, Heyne ran out of the back door with his gun in a pillowcase and with marijuana and cocaine he took from the master bedroom. Heyne called a friend, Roxanne Larabie, and asked her to pick him up. Larabie testified that Heyne admitted to shooting Benjamin and Sarah and that when she asked about Ivory, Heyne “just looked at me and said she was gone.” Larabie helped Heyne obtain new clothes identical to the ones he was wearing. When they arrived at Larabie’s house, Heyne washed the new clothes in an effort to make them appear worn. He removed his old shoes and clothes, wrapped up his gun in the pillowcase, and put all of the items in a box in Larabie’s attic. Law enforcement retrieved the items and discovered bloodstains matching Benjamin’s DNA profile on Heyne’s pants and the pillowcase.
Heyne was apprehended and questioned regarding the murder, and a videotape of the interrogation was played for the jury at trial. Initially, Heyne denied that he was at the house at the time of the murder. But when an investigating officer interrupted the interrogation with news that Heyne’s gun, bloodied clothing, and pillowcase were discovered in a box in Larabie’s attic, Heyne confessed to shooting Benjamin and Sarah and acknowledged seeing Ivory “go down.” At the time, Heyne could not remember shooting Ivory and repeatedly denied that he would have shot her on purpose. However, he acknowledged shooting both the 9-mm and the .38 Special and directed the interrogating officer as the officer drew a diagram of the room depicting the placement of Heyne and all three victims during the shootings. Heyne said that his argument with Benjamin began as a non-violent confrontation in which Benjamin never threatened him or pointed his gun in Heyne’s direction.
At trial, Heyne advanced the theory that he shot Benjamin and Sarah in self-defense, specifically suggesting in closing arguments that Sarah may have been trying to access a shotgun under the bed. As for Ivory, Heyne argued that the evidence supported an accidental shooting. The prosecution attempted to foreclose the possibility of self-defense and accident, relying heavily on the diagram drawn during Heyne’s interrogation to show that the relative positioning of Heyne and the victims precluded either scenario. Ultimately, the jury found Heyne guilty of first-degree premeditated murder of all three victims.
*119 At the penalty phase, Heyne presented mitigation testimony from former educators, family members, and evaluating psychologists. His former educators attested to Heyne’s status as a special education student, and his family members testified that he was a caring but difficult child. Dr. Joseph Wu testified that imaging from a PET scan showed damage to Heyne’s temporal and parietal lobes, evidencing learning difficulties, causing problems regulating aggression and impulse, and making addiction to alcohol and drugs more likely. Dr. Wu also testified that imaging was consistent with a history of traumatic brain injuries and specifically noted two concussions Heyne suffered as a child, another head injury when Heyne was incarcerated in 2004, and a slow processing speed relative to his IQ score of 88. Dr. William Riebsame diagnosed Heyne with ADHD and possible bipolar disorder — one or both of which caused Heyne to have impulse control disorder— as well as cocaine and alcohol use and dependence at the time of the offense. Dr. Riebsame also discussed Heyne’s history of impulsivity, including two documented suicide attempts. Dr. Riebsame revealed that Heyne had confessed to shooting Ivory, whom Heyne said was crying and pulling on his shorts after he shot Benjamin.
The jury recommended life imprisonment for the murder of Benjamin, the death penalty for the murder of Sarah by a vote of eight to four, and the death penalty for the murder of Ivory by a vote of ten to two.
The trial court followed the jury’s recommendation of death for the murder of Ivory but sentenced Heyne to life imprisonment for the murders of Benjamin and Sarah. For the murder of Ivory, the trial court found three aggravators: (1) Heyne was previously convicted of a felony involving the use or threat of violence (great weight); (2) the murder was especially heinous, atrocious, or cruel (HAC) (great weight); and (3) the victim was less than twelve years of age (great weight). The trial court found the following mitigators: (1) Heyne suffers from a mental illness (great weight); (2) Heyne has brain damage and brain deficits (great weight); (3) Heyne had a problem with substance abuse and dependence (moderate weight); (4) Heyne had an impaired capacity to appreciate the criminality of his conduct or conform it to the requirements of law (moderate weight); (5) Heyne was under the influence of a mental or emotional disturbance (little weight); (6) Heyne was a good, caring father to a handicapped son (very little weight); (7) Heyne cared for and helped elderly neighbors when he was a child (very little weight); (8) Heyne gave his flannel jacket to a homeless person (very little weight); (9) Heyne protected younger, weaker children when he was a child (very little weight); (10) Heyne played football and other sports as a child and was devastated when he could no longer play (very little weight); (11) Heyne was recommended to receive in-patient psychiatric treatment at age five but did not receive treatment (moderate weight); (12) Heyne has a history of suicide attempts and self-destructive behavior (moderate weight); and (13) Heyne exhibited good behavior during trial (some weight).
II. ISSUES RAISED ON APPEAL
Heyne raises four issues on appeal: (A) the trial court erred in denying his motion for judgment of acquittal; (B) the trial court erred in finding the HAC aggravator for the murder of Ivory; (C) the trial court erred in assessing the mental health mitigating evidence; and (D) the death sen *120 tence is not proportionate.[2] None of these claims warrant relief.
A. Denial of Motion for Judgment of Acquittal
Heyne argues that the trial court erred in denying the motion for judgment of acquittal at the conclusion of the prosecution’s guilt-phase case because the evidence of premeditation was circumstantial and did not disprove every reasonable hypothesis of innocence. For the reasons that follow, we disagree.
This Court has defined premeditation as “a fully formed conscious purpose to kill that may be formed in a moment and need only exist for such time as will allow the accused to be conscious of the nature of the act he is about to commit and the probable result of that act.” Miller v. State, 42 So.3d 204, 228 (Fla.2010) (quoting Asay v. State, 580 So.2d 610, 612 (Fla.1991)), cert. denied — U.S. —, 181 S.Ct. 985, 178 L.Ed.2d 776 (2011). “Circumstantial evidence of premeditation can include the nature of the weapon used, the presence or absence of adequate provocation, previous difficulties between the parties, the manner in which the homicide was committed, and the nature and manner of the wounds inflicted.” Pearce v. State, 880 So.2d 561, 572 (Fla.2004).
A trial court’s determination on the sufficiency of evidence to prove premeditation is guided by the following principles:
Premeditation is a factual issue for the jury, Asay [, 580 So.2d at 612], and several standards of review are applicable. The following standard applies where the evidence of premeditation is direct, whether in whole or in part: as with other factual findings, a jury’s finding of premeditation will be sustained if supported by competent, substantial evidence in the record. See, e.g., Wheeler v. State, 4 So.3d 599, 605 (Fla.), cert. denied, — U.S. —, 130 S.Ct. 178, 175 L.Ed.2d 112 (2009). Where the evidence of premeditation is wholly circumstantial, on the other hand, the following standard applies: not only must the evidence be sufficient to support the finding of premeditation, but the evidence, when viewed in the light most favorable to the State, must also be inconsistent with any other reasonable inference. Cochran v. State, 547 So.2d 928, 930 (Fla.1989).
Twilegar v. State, 42 So.3d 177, 190 (Fla.2010), cert. denied, — U.S. —, 131 S.Ct. 1476, 179 L.Ed.2d 315 (2011).
This Court reviews de novo the trial court’s denial of a motion for judgment of acquittal. Delgado v. State, 71 So.3d 54, 65 (Fla.2011). “Where the State has presented competent, substantial evidence of the crimes charged, the trial court does not err in denying a motion for judgment of acquittal and submitting the case to the jury.” McDuffie v. State, 970 So.2d 312, 332 (Fla.2007).
Here, even assuming the wholly circumstantial test applies to all three murders, the trial court did not err in finding sufficient evidence of premeditation because the evidence is inconsistent with any other reasonable inference. See McWatters v. State, 36 So.3d 613, 631 (Fla.2010). We address each murder in turn.

1. Benjamin

The evidence concerning the shooting of Benjamin was sufficient to support a *121 finding of premeditation and was inconsistent with any other reasonable inference. Specifically, the prosecution presented the following evidence, much of which derives from Heyne’s statement to law enforcement: (1) Heyne and Benjamin were arguing, and Benjamin treated Heyne in a manner that made Heyne feel disrespected; (2) Heyne heard Benjamin cock his gun and then went to his room to retrieve his own gun; (3) Heyne returned to the room with his gun and continued to argue with Benjamin; (4) the two continued to argue while holding their respective guns, but Benjamin neither pointed his gun at Heyne nor waved it around; (5) Heyne pushed Benjamin onto the bed, yet an autopsy revealed no additional signs of a struggle between the two; (6) before any shots were fired, Benjamin voluntarily relinquished his gun, and Heyne picked it up; and (7) Heyne admitted to pointing his gun at Benjamin and firing it in his direction. This evidence provided a basis for the jury to conclude that Heyne had time to reflect and form the intent to kill Benjamin because it demonstrated that Heyne left in the middle of the argument to deliberately select a deadly weapon, then returned to shoot Benjamin even after Benjamin disarmed himself. See Floyd v. State, 850 So.2d 388, 397 (Fla.2002) (“Floyd’s deliberate selection and transportation of a gun to the victim’s home is clearly inconsistent with his theory that he argued with the victim and simply shot her in a moment of uncontrolled rage without having fully formed a conscious purpose to kill.”).
Because the evidence was sufficient to support a finding of premeditation and was inconsistent with any other reasonable inference, we affirm the trial court’s denial of the motion for judgment of acquittal as to the first-degree murder of Benjamin.

2. Sarah

Likewise, the evidence concerning the shooting of Sarah was sufficient to support a finding of premeditation and was inconsistent with any other reasonable inference. First, Heyne’s statement provided evidence that (1) Sarah ran into the bedroom after Heyne shot Benjamin, and she “panicked and got on the floor” on the opposite side of the bed; (2) Heyne was motivated to shoot Sarah “because she was screaming”; (3) Heyne also shot Sarah because it crossed his mind that she could have served as a witness to the shooting of Benjamin.
Second, the prosecution presented evidence inconsistent with Heyne’s suggestion at closing argument that he shot Sarah in a panic because she was accessing a shotgun underneath the bed. See Henry v. State, 574 So.2d 73, 74 (Fla.1991) (holding that physical evidence inconsistent with Henry’s hypothesis of innocence provided “enough evidence.to present a jury question on the issue of premeditation”). On this point, the prosecution presented evidence that (1) the latched case housing the shotgun had not been accessed when it was found underneath the bed; (2) Sarah had come from a room in which Heyne knew there to “always” be a loaded firearm; (3) Heyne shot Sarah when she had her arm up and her head turned, possibly in an attempt to protect herself; (4) Sarah was on the side of the bed opposite Heyne when shot but was shot in the back of the head, making it unlikely that she was facing toward and reaching underneath the bed; and (5) there were no bullet holes through the mattress, eliminating the possibility that her head was turned from Heyne because it was under the bed.
Because the prosecution presented evidence that was sufficient to support a finding of premeditation and was inconsistent with any other reasonable inference, we *122 affirm the trial court’s denial of the motion for judgment of acquittal as to the first-degree murder of Sarah.

3. Ivory

Finally, although Heyne repeatedly denied that he purposefully shot Ivory, the circumstantial evidence surrounding the shooting of Ivory was sufficient to support a finding of premeditation and was inconsistent with any other reasonable inference. Specifically, the prosecution presented evidence that (1) Heyne told law enforcement that he remembered Ivory pulling on his shorts after he shot her father and that he remembered firing at least two more shots; (2) Heyne had time to see that Ivory appeared to be “in shock” after he shot Benjamin; (3) Ivory was five years old and posed no physical threat to Heyne; (4) Ivory was violently slapped in the face just prior to her death, likely by a man; (5) the muzzle of the gun was less than two feet from Ivory’s face when it was fired; and (6) according to Heyne’s diagram of the room, Heyne and Ivory were positioned in the room in a way that Heyne would have had to walk around the bed in order to slap Ivory and then shoot her from a distance less than two feet.
Accordingly, we affirm the trial court’s denial of Heyne’s motion for judgment of acquittal.
B. HAC Aggravator
Heyne argues that the trial court erred in finding the HAC aggravator because there was no evidence that Ivory experienced terror and fear prior to her death. We disagree.
The HAC aggravator applies when “[t]he capital felony was especially heinous, atrocious, or cruel.” § 921.141(5)(h), Fla. Stat. (2009). Additionally, this Court has held “that for this factor to apply, the murder must be conscienceless or pitiless and unnecessarily torturous to the victim.” Diaz v. State, 860 So.2d 960, 966 (Fla.2003). In determining whether the victim experienced such fear, the trial court views the circumstances “from the unique perspective of the victim,” Banks v. State, 700 So.2d 363, 367 (Fla.1997), and “in accordance with a common-sense inference from the circumstances.” Allred v. State, 55 So.3d 1267, 1280 (Fla.2010) (quoting Swafford v. State, 533 So.2d 270, 277 (Fla.1988)), cert. denied, - U.S. -, 132 S.Ct. 181, 181 L.Ed.2d 91 (2011). “[F]ear, emotional strain, and terror of the victim during the events leading up to the murder may make an otherwise quick death especially heinous, atrocious, or cruel.” Lynch v. State, 841 So.2d 362, 369 (Fla.2003) (quoting James v. State, 695 So.2d 1229, 1235 (Fla.1997)).
When this Court reviews the sentencing court’s finding of an aggravator,
“[I]t is not this Court’s function to reweigh the evidence to determine whether the State proved each aggravating circumstance beyond a reasonable doubt — that is the trial court’s job.” Willacy v. State, 696 So.2d 693, 695 (Fla.1997). Rather, “[i]n reviewing an aggravating factor challenged on appeal, this Court’s task ‘is to review the record to determine whether the trial court applied the right rule of law for each aggravating circumstance, and, if so, whether competent substantial evidence supports its finding.’ ” Hernandez v. State, 4 So.3d 642, 667 (Fla.2009) (quoting Douglas v. State, 878 So.2d 1246, 1260-61 (Fla.2004)).
Serrano v. State, 64 So.3d 93, 113-14 (Fla.2011).
Here, the trial court applied the right rule of law, and there is competent, substantial evidence to support the trial *123 court’s finding that the victim experienced fear and terror prior to her death. In its sentencing order, the trial court recognized that, because “[d]eath by gunshot is generally instantaneous,” a finding of HAC does not usually follow “unless the shooting is accompanied by additional acts resulting in mental or physical torture to the victim.” Here, the trial court found that Ivory, who was five years old, witnessed the murder of her father and her mother prior to her own death, all within the same room. The trial court then determined that Ivory was crying and pulling on Heyne’s shorts and “experienced terror and fear no five year old child should ever experience in those brief moments” leading up to the murder.
Accordingly, because the trial court applied the correct rule of law and because the HAC aggravator was supported by competent, substantial evidence, we affirm the trial court’s finding.
C. Mental Health Mitigating Evidence
Next, Heyne argues that the trial court erred in rejecting expert testimony introduced to establish both statutory mental health mitigators. However, we conclude that the trial court did not abuse its discretion when rejecting the proposed statutory mitigators.
This Court has established several broad principles applicable to the trial court’s evaluation of proposed mitigators:
A trial court must find as a mitigating circumstance each proposed factor that has been established by the greater weight of the evidence and that is truly mitigating in nature. However, a trial court may reject a proposed mitigator if the mitigator is not proven or if there is competent, substantial evidence to support its rejection. Even expert opinion evidence may be rejected if that evidence cannot be reconciled with other evidence in the case. Finally, even where a mitigating circumstance is found a trial court may give it no weight when that circumstance is not mitigating based on the unique facts of the case.
Coday v. State, 946 So.2d 988, 1003 (Fla.2006).
When this Court reviews a trial court’s finding on a mitigator, it operates under the following standards of review:
Where it is clear that the trial court has considered all evidence presented in support of a mitigating factor, the court’s decision as to whether that circumstance is established will be reviewed only for abuse of discretion. See Harris v. State, 843 So.2d 856, 868 (Fla.2003); Foster v. State, 679 So.2d 747, 755 (Fla.1996). The trial court’s findings will be upheld where there is competent, substantial evidence in the record to support each finding. See Lebron v. State, 982 So.2d 649, 660 (Fla.2008). The weight assigned to an established mitigating circumstance is also reviewed for abuse of discretion. Id.
... However, a trial court’s findings on mitigation are also subject to review for harmless error, and this Court will not overturn a capital appellant’s sentence if it determines that an error was harmless beyond a reasonable doubt. See Lebron, 982 So.2d at 661; Singleton v. State, 783 So.2d 970, 977 (Fla.2001).
Ault v. State, 53 So.3d 175, 186-87 (Fla.2010).
The proposed statutory mitigators are addressed in turn.

1. Impaired capacity mitigator

Here, Dr. Riebsame testified that, because of Heyne’s mental disorders— ADHD and possible bipolar disorder — and self-reported drug and alcohol use at the time of the shootings, Heyne’s capacity to *124 conform his conduct to the requirements of law was substantially impaired. The trial court partially rejected this expert testimony, finding that Heyne did have an impaired capacity but that the impairment was less than substantial. This finding was based in part on a separate finding that Heyne used drugs on the day of the murders but that the drugs did not hinder his ability to obtain a murder weapon, fire it with fatal accuracy, contact Larabie, or conceal incriminating evidence. The trial court gave moderate weight to the miti-gator of impaired (but less than substantially impaired) capacity.
The trial court’s finding on the impaired capacity mitigator was not an abuse of discretion because it was supported by competent, substantial evidence. See Ault, 53 So.3d at 187. Therefore, we affirm the trial court’s finding.
This Court has held that competent, substantial evidence supports the rejection of expert testimony in support of the substantially impaired capacity miti-gator where other evidence concerning the defendant’s capacity conflicts with the expert testimony. See Coday, 946 So.2d at 1003 (“Even expert opinion evidence may be rejected if that evidence cannot be reconciled with the other evidence in the case.”); see also Williams v. State, 37 So.3d 187, 204 (Fla.2010) (“[T]he rejection of expert testimony must have a rational basis, such as conflict with other evidence ....”) (emphasis added). Under similar reasoning, “[t]his Court has previously upheld rejection of this statutory mitigating factor where a defendant ‘took logical steps to conceal his actions from others.’ ” Zommer v. State, 31 So.3d 733, 750 (Fla.2010) (quoting Nelson v. State, 850 So.2d 514, 531 (Fla.2003) (quoting trial court’s order)). Evidence of “logical steps” conflicts with expert testimony on this mitigator because they constitute “purposeful actions ... indicative of someone who knew those acts were wrong and who could conform his conduct to the law if he so desired.” Hoskins v. State, 965 So.2d 1, 18 (Fla.2007) (quoting Nelson, 850 So.2d at 531).
In this case, the record includes evidence that conflicts with the expert testimony, specifically, Heyne’s “purposeful actions ... indicative of someone who knew those acts were wrong and who could conform his conduct to the law if he so desired.” Id. (quoting Nelson, 850 So.2d at 531). Following the shootings, Heyne took one of the murder weapons and placed it in a pillowcase, ran from the house, contacted an ex-girlfriend, and went back to her house. In an effort to conceal his involvement, Heyne took a shower, obtained replacement clothing identical to the clothing he wore when he committed the murders, washed the replacement clothing to make it look worn, hid the murder weapon and bloody clothes in the attic, and then lied to police about his involvement in the murder.
Additionally, there was a conflict in the evidence regarding Heyne’s self-reported drug use on the day of the murder, a factor vital to the experts’ evaluation of Heyne’s impulse control. In its sentencing order, the trial court observed that if Heyne was intoxicated on the day of the shooting, his intoxication was not so significant that it limited his ability to obtain a weapon, fire it accurately, contact Larabie, and then conceal the murder weapon, clothing, and drugs. See Zommer, 31 So.3d at 750 (“[A]lthough Zommer may have had some drugs in his system at the time of the murder, the evidence does not support a finding that those drugs substantially impaired his capacity....”). Additional conflicting evidence not referenced in the sentencing order included the observations of the officers, who said that *125 Heyne did not appear intoxicated later that day, and the toxicology report showing an absence of cocaine in Benjamin, with whom Heyne claimed to have used cocaine earlier that day.
Therefore, we affirm the trial court’s finding on impaired capacity.

2. Emotional disturbance mitigator

Dr. Riebsame testified that the combination of Heyne’s mental disorders and self-reported intoxication at the time of the shootings placed him under the influence of an extreme mental or emotional disturbance. He clarified on cross-examination, however, that his opinion on extreme emotional disturbance would be different absent intoxication. Dr. Joseph Wu also testified that Heyne was under the influence of an extreme mental or emotional disturbance, but in questioning Dr. Wu, defense counsel asked the expert to assume intoxication in forming his opinion. As with the impaired capacity mitigator, the trial court partially rejected this expert testimony, finding that Heyne was under an emotional disturbance that was less than extreme. Again, the trial court referenced the separate finding on drug use at the time of the murder. Still, the evidence on Heyne’s less-than-extreme emotional disturbance was treated as a nonstatutory mitigator and was given little weight.
The trial court did not abuse its discretion because its finding on the emotional disturbance mitigator was supported by competent, substantial evidence. Therefore, we affirm.
“[E]xpert testimony alone does not require a finding of extreme mental or emotional disturbance.” Foster, 679 So.2d at 755. Instead, the trial court may disregard expert opinion where it determines that the opinion is unsupported by the facts or conflicts with other evidence. See, e.g., Ault, 53 So.3d at 189 (determining that evidence of a planned attack conflicted with a finding of extreme emotional disturbance). More specifically, we have held that testimony from lay witnesses concerning the defendant’s condition on the day of the murder may serve as competent, substantial evidence to support rejection of expert testimony on the extreme emotional disturbance mitigator. See, e.g., Nelson, 850 So.2d at 530; Rose v. State, 787 So.2d 786, 803 (Fla.2001) (holding that the trial court did not abuse its discretion in rejecting expert testimony regarding intoxication where two law enforcement officers testified that the defendant appeared to be sober and a bartender testified that he did not see the defendant at the bar he claimed to have visited).
Here, the trial court’s finding was based on competent, substantial evidence. Dr. Riebsame expressly stated that his opinion on the extreme emotional disturbance circumstance would be different if Heyne was not intoxicated on the day of the murder, yet the sole source of Dr. Riebsame’s belief that Heyne was intoxicated was Heyne’s self-report. Heyne’s second expert, Dr. Wu, was asked by the defense to assume intoxication in rendering his opinion. Meanwhile, the prosecution presented testimony from law enforcement officers in close contact with Heyne on the day of the murder who said that they observed no sign of alcohol or cocaine intoxication. A toxicology report indicated that Benjamin had no cocaine in his system just hours after the shooting, contrary to Heyne’s report that they used cocaine together that day. Therefore, the trial court did not abuse its discretion in finding that the disturbance was something short of “extreme.” See Foster, 679 So.2d at 756 (“It is clear from the sentencing order that the trial court gave some weight to non-statutory mitigation; however, the trial *126 court did not find that it rose to the level of this statutory mitigator. Accordingly, we find that the trial court did not abuse its discretion....”).
In sum, the trial court did not abuse its discretion in assessing the mental health mitigating evidence. The trial court’s findings were supported by competent, substantial evidence.
D. Proportionality
Heyne argues that his sentence of death is not proportionate. For the reasons that follow, we disagree.
This Court is required to review the proportionality of a death sentence “in order to prevent the imposition of unusual punishments under the Florida Constitution.” Phillips v. State, 39 So.3d 296, 305 (Fla.2010), cert denied, — U.S. —, 131 S.Ct. 520, 178 L.Ed.2d 384 (2010). However, in analyzing proportionality, “[t]his Court’s function is not to reweigh the mitigating factors against the aggravating factors; that is the function of the trial judge.” Id. (quoting Blake v. State, 972 So.2d 839, 846 (Fla.2007)). Instead, “[i]n deciding whether death is a proportionate penalty, this Court considers the ‘totality of the circumstances in a case’ and compares the case with other capital cases.” Id. (quoting Sliney v. State, 699 So.2d 662, 672 (Fla.1997)). As it compares the case with others, this Court performs “a two-pronged inquiry ... to ‘determine [whether] the crime falls within the category of both (1) the most aggravated, and (2) the least mitigated of murders.’ ” Ault, 53 So.3d at 196 (quoting Almeida v. State, 748 So.2d 922, 933 (Fla.1999)). The review is “a qualitative review by this Court of the underlying basis for each aggravator and mitigator rather than a quantitative analysis.” Urbin v. State, 714 So.2d 411, 416 (Fla.1998). In other words, “comparison is not simply a calculation of the number of aggravators and mitigators.” Lebron, 982 So.2d at 668.
In this case, the jury recommended death for the murder of Ivory by a ten to two vote. The trial court found three ag-gravators and gave them all great weight: (1) prior violent felony; (2) the murder was especially heinous, atrocious, or cruel (HAC); and (3) the victim was less than twelve years of age. “[T]he heinous, atrocious, or cruel aggravator is one of the ‘most serious aggravators set out in the statutory sentencing scheme.’ ” Aguirre-Jarquin v. State, 9 So.3d 593, 610 (Fla.2009) (quoting Larkins v. State, 739 So.2d 90, 95 (Fla.1999)). And “the prior violent felony aggravator is considered one of the weightiest aggravators.” Silvia v. State, 60 So.3d 959, 974 (Fla.2011). The trial court found thirteen mitigators: (1) Heyne suffers from a mental illness (great weight); (2) Heyne has brain damage and brain deficits (great weight); (3) Heyne had a problem with substance abuse and dependence (moderate weight); (4) Heyne had an impaired capacity to appreciate the criminality of his conduct or conform it to the requirements of law (moderate weight); (5) Heyne was under the influence of a mental or emotional disturbance (little weight); (6) Heyne was a good, caring father to a handicapped son (very little weight); (7) Heyne cared for and helped elderly neighbors when he was a child (very little weight); (8) Heyne gave his flannel jacket to a homeless person (very little weight); (9) Heyne protected younger, weaker children when he was a child (very little weight); (10) Heyne played football and other sports as a child and was devastated when he could no longer play (very little weight); (11) Heyne was recommended to receive in-patient psychiatric treatment at age five but did not receive treatment (moderate weight); (12) Heyne has a history of suicide attempts and self-destructive behavior (moderate *127 weight); and (13) Heyne exhibited good behavior during trial (some weight).
This Court has found the death sentence proportionate in similar cases. See, e.g., Lynch, 841 So.2d 362 (death sentence proportionate in double homicide where, for the murder of the child victim, the trial court found aggravators of HAC, prior violent felony, and commission in the course of a felony; statutory mitigation of no significant criminal history; and non-statutory mitigation of mental or emotional disturbance, impaired capacity, mental illness, and alcohol abuse); Ocha v. State, 826 So.2d 956 (Fla.2002) (death sentence proportionate with aggravators of HAC and prior violent felony and nonstatutory mitigators including learning disability, post-traumatic stress disorder, intoxication on the night of the offense, psychiatric disturbance, and “extensive history” of substance abuse); Rogers v. State, 783 So.2d 980 (Fla.2001) (death sentence proportionate with aggravators of HAC and pecuniary gain; statutory mitigation of impaired capacity; and nonstatutory miti-gators including alcohol use on the day of the offense); Singleton v. State, 783 So.2d 970 (Fla.2001) (death sentence proportionate with aggravators of HAC and prior violent felony; statutory mitigators of extreme disturbance, impaired capacity, and age; and nonstatutory mitigators including alcoholism, mild dementia, and intoxication at the time of the offense).
Accordingly, we find the death penalty proportionate here.
III. SUFFICIENCY OF THE EVIDENCE
This Court independently reviews the record of a death penalty case to determine whether the evidence is sufficient to support the murder conviction. See Winkles v. State, 894 So.2d 842, 847 (Fla.2005). Here, there is competent, substantial evidence to support the murder convictions. See Durousseau v. State, 55 So.3d 543, 559-60 (Fla.2010), cert. denied, — U.S. —, 132 S.Ct. 149, 181 L.Ed.2d 66 (2011).
In his confession, Heyne described a verbal dispute he had with Benjamin, during which Heyne retrieved a gun from his room and returned to continue the argument with Benjamin. Heyne admitted that Benjamin dropped the gun and that he picked up Benjamin’s gun before pointing a gun at Benjamin and shooting. Blood found on Heyne’s clothing and pillowcase matched Benjamin’s DNA profile. He then admitted to shooting Sarah “because she was screaming” and because she could have served as a witness against him in the murder of Benjamin. As for Ivory, Heyne initially said that he could not remember shooting Ivory, but the evidence at the guilt phase demonstrated that Ivory was violently slapped in the face and then shot at close range with the same gun Heyne admitted to using in the murder and then hiding in Larabie’s attic. Heyne admitted seeing Ivory “go down” prior to leaving the scene and told his ex-girlfriend after the murder that Ivory was “gone.” He later admitted to his psychologist that he shot Ivory.
Because there is competent substantial evidence to support the murder convictions, we affirm.
IV. CONCLUSION
For the reasons expressed above, we affirm Heyne’s convictions and sentence of death for the murder of Ivory Hamilton.[3]
It is so ordered.
*128 CANADY, C.J., and PARIENTE, LEWIS, QUINCE, POLSTON, LABARGA, and PERRY, JJ., concur.

. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const.

. Heyne also claims that his sentence is unconstitutional under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). Yet Ring does not apply to cases where, as here, the prior violent felony aggravator exists. See Hodges v. State, 55 So.3d 515, 540 (Fla.2010), cert. denied, - U.S. -, 132 S.Ct. 164, 181 L.Ed.2d 77 (2011).

. The State cross-appealed, arguing that the trial court erred in rejecting the aggravator of commission for the purpose of avoiding or preventing a lawful arrest for the murder of *128 Ivory. Because we affirm the death sentence for the murder of Ivory, we need not address the State’s cross-appeal.