# Supreme Court of Florida

————————

No. SC14-1800

————————

**JUSTIN CURTIS HEYNE**,
Appellant,

vs.

**STATE OF FLORIDA**,
Appellee.

[April 6, 2017]

PER CURIAM.

Justin Curtis Heyne filed an initial motion for postconviction relief under

Florida Rule of Criminal Procedure 3.851, which the trial court denied after

holding an evidentiary hearing.  For the reasons expressed below, we affirm the

denial of the guilt phase claims but remand for a new penalty phase pursuant to

Hurst v. State, 202 So. 3d 40 (Fla. 2016) petition for cert. filed, No. 16-998 (U.S.

Feb. 13, 2017).[1]

———————————

    1.  This Court has jurisdiction.  See art. V, § 3(b)(1), Fla. Const.  Because we
are remanding for a new penalty phase, we do not address the penalty phase claim
that Heyne raised in the appeal of the denial of his postconviction motion.

# BACKGROUND

Heyne was convicted for the 2006 murders of Sarah Buckoski, Benjamin

Hamilton, and five-year-old Ivory Hamilton. Heyne v. State, 88 So. 3d 113, 117

(Fla. 2012). He was sentenced to death for Ivory's murder. Id. When affirming

the convictions and death sentence on direct appeal, this Court described the

background as follows:

> On March 30, 2006, Sarah Buckoski returned to her home with
> her five-year-old daughter, Ivory Hamilton, to find Heyne and Ivory's
> father, Benjamin Hamilton, engaged in a verbal dispute. The dispute
> centered on money Heyne owed to Benjamin and took place in the
> master bedroom, a 12–by 13–foot room in which law enforcement
> later discovered drug paraphernalia and several pounds of marijuana.
> Heyne worked with Benjamin and was temporarily residing with
> Benjamin, Sarah, and Ivory in Titusville, Florida. Heyne was 24
> years old. Benjamin and Sarah were 26 and 24, respectively.
> As the argument escalated, Heyne began to feel disrespected.
> He started to walk away when he heard Benjamin cock a 9–mm gun.
> Heyne left, retrieved a .38 Special from his room, and then returned to
> the master bedroom to continue the argument with Benjamin. The
> two argued while holding their respective guns but did not point them
> at one another while arguing. Heyne pushed Benjamin onto the bed.
> At some point during the dispute, Ivory entered the room, prompting
> Benjamin to drop the 9–mm. Heyne picked up Benjamin's 9–mm.
> Benjamin told Ivory to leave the room, and she turned to walk out.

In its sentencing order, the trial court detailed the shootings as
follows:

> Benjamin Hamilton was shot at a distance of no more
> than four or five feet. At that point, Sarah Buckoski dove
> to the floor on the far side of the bed near the wall and
> started screaming. The defendant shot her next. She was
> shot one time, but the bullet passed through her arm
> before it entered the center of the back of the head. At

that point, Ivory began to pull on the defendant's shorts and the defendant shot her one time in the head at point blank range.

When law enforcement arrived on the scene, Benjamin was struggling for air on the bed, Sarah was on the floor next to the bed in a fetal position screaming, and Ivory was lying on the floor without a pulse. An autopsy revealed that just prior her death, Ivory was slapped in the face in a manner violent enough to cause a rupture of the blood vessel beneath the skin. A bullet fired from Heyne's .38 Special was found in her skull.

After the shooting, Heyne ran out of the back door with his gun in a pillowcase and with marijuana and cocaine he took from the master bedroom. Heyne called a friend, Roxanne Larabie, and asked her to pick him up. Larabie testified that Heyne admitted to shooting Benjamin and Sarah and that when she asked about Ivory, Heyne "just looked at me and said she was gone." Larabie helped Heyne obtain new clothes identical to the ones he was wearing. When they arrived at Larabie's house, Heyne washed the new clothes in an effort to make them appear worn. He removed his old shoes and clothes, wrapped up his gun in the pillowcase, and put all of the items in a box in Larabie's attic. Law enforcement retrieved the items and discovered bloodstains matching Benjamin's DNA profile on Heyne's pants and the pillowcase.

Heyne was apprehended and questioned regarding the murder, and a videotape of the interrogation was played for the jury at trial. Initially, Heyne denied that he was at the house at the time of the murder. But when an investigating officer interrupted the interrogation with news that Heyne's gun, bloodied clothing, and pillowcase were discovered in a box in Larabie's attic, Heyne confessed to shooting Benjamin and Sarah and acknowledged seeing Ivory "go down." At the time, Heyne could not remember shooting Ivory and repeatedly denied that he would have shot her on purpose. However, he acknowledged shooting both the 9–mm and the .38 Special and directed the interrogating officer as the officer drew a diagram of the room depicting the placement of Heyne and all three victims during the shootings. Heyne said that his argument with Benjamin began as a non-violent confrontation in which Benjamin never threatened him or pointed his gun in Heyne's direction.

At trial, Heyne advanced the theory that he shot Benjamin and Sarah in self-defense, specifically suggesting in closing arguments

that Sarah may have been trying to access a shotgun under the bed. As for Ivory, Heyne argued that the evidence supported an accidental shooting. The prosecution attempted to foreclose the possibility of self-defense and accident, relying heavily on the diagram drawn during Heyne's interrogation to show that the relative positioning of Heyne and the victims precluded either scenario. Ultimately, the jury found Heyne guilty of first-degree premeditated murder of all three victims.

At the penalty phase, Heyne presented mitigation testimony from former educators, family members, and evaluating psychologists. His former educators attested to Heyne's status as a special education student, and his family members testified that he was a caring but difficult child. Dr. Joseph Wu testified that imaging from a PET scan showed damage to Heyne's temporal and parietal lobes, evidencing learning difficulties, causing problems regulating aggression and impulse, and making addiction to alcohol and drugs more likely. Dr. Wu also testified that imaging was consistent with a history of traumatic brain injuries and specifically noted two concussions Heyne suffered as a child, another head injury when Heyne was incarcerated in 2004, and a slow processing speed relative to his IQ score of 88. Dr. William Riebsame diagnosed Heyne with ADHD and possible bipolar disorder—one or both of which caused Heyne to have impulse control disorder—as well as cocaine and alcohol use and dependence at the time of the offense. Dr. Riebsame also discussed Heyne's history of impulsivity, including two documented suicide attempts. Dr. Riebsame revealed that Heyne had confessed to shooting Ivory, whom Heyne said was crying and pulling on his shorts after he shot Benjamin.

The jury recommended life imprisonment for the murder of Benjamin, the death penalty for the murder of Sarah by a vote of eight to four, and the death penalty for the murder of Ivory by a vote of ten to two.

The trial court followed the jury's recommendation of death for the murder of Ivory but sentenced Heyne to life imprisonment for the murders of Benjamin and Sarah. For the murder of Ivory, the trial court found three aggravators: (1) Heyne was previously convicted of a felony involving the use or threat of violence (great weight); (2) the murder was especially heinous, atrocious, or cruel (HAC) (great weight); and (3) the victim was less than twelve years of age (great weight). The trial court found the following mitigators: (1) Heyne

suffers from a mental illness (great weight); (2) Heyne has brain damage and brain deficits (great weight); (3) Heyne had a problem with substance abuse and dependence (moderate weight); (4) Heyne had an impaired capacity to appreciate the criminality of his conduct or conform it to the requirements of law (moderate weight); (5) Heyne was under the influence of a mental or emotional disturbance (little weight); (6) Heyne was a good, caring father to a handicapped son (very little weight); (7) Heyne cared for and helped elderly neighbors when he was a child (very little weight); (8) Heyne gave his flannel jacket to a homeless person (very little weight); (9) Heyne protected younger, weaker children when he was a child (very little weight); (10) Heyne played football and other sports as a child and was devastated when he could no longer play (very little weight); (11) Heyne was recommended to receive in-patient psychiatric treatment at age five but did not receive treatment (moderate weight); (12) Heyne has a history of suicide attempts and self-destructive behavior (moderate weight); and (13) Heyne exhibited good behavior during trial (some weight).

Id. at 117-19.

On direct appeal, this Court rejected a Ring claim as well as four other claims: "(A) the trial court erred in denying his motion for judgment of acquittal; (B) the trial court erred in finding the HAC aggravator for the murder of Ivory; (C) the trial court erred in assessing the mental health mitigating evidence; and (D) the death sentence is not proportionate." Id. at 119-20.

In October 2013, Heyne filed an initial motion for postconviction relief, which the trial court denied after holding an evidentiary hearing.

# ANALYSIS

## I.

First, Heyne claims that trial counsel was ineffective for failing to file a motion to suppress his confession based upon a violation of <u>Miranda v. Arizona</u>, 384 U.S. 486 (1966). Specifically, Heyne claims that trial counsel should have alleged that Heyne invoked his rights to counsel and silence after initially waiving his <u>Miranda</u> rights. However, this Court affirms the trial court's denial of relief.

Following the United States Supreme Court's decision in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), this Court has explained that for ineffective assistance of counsel claims to be successful, two requirements must be satisfied:

> First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined.

<u>Bolin v. State</u>, 41 So. 3d 151, 155 (Fla. 2010) (quoting <u>Maxwell v. Wainwright</u>, 490 So. 2d 927, 932 (Fla. 1986)).

Regarding the deficiency prong of <u>Strickland</u>, there is a strong presumption that trial counsel's performance was not ineffective. <u>Strickland</u>, 466 U.S. at 690. Moreover, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from

counsel's perspective at the time." Id. at 689.  Further, counsel cannot be deemed ineffective for failing to make a meritless argument.  Melendez v. State, 612 So. 2d 1366, 1369 (Fla. 1992), abrogated on other grounds by Deren v. State, 985 So. 2d 1087 (Fla. 2008).  "Regarding the prejudice prong of Strickland, the defendant must show that there is a reasonable probability that, 'absent the [deficient performance], the factfinder would have [had] a reasonable doubt respecting guilt.' " Dennis v. State, 109 So. 3d 680, 690 (Fla. 2012) (quoting Strickland, 466 U.S. at 695).  "A reasonable probability is a 'probability sufficient to undermine confidence in the outcome.' " Id. (quoting Strickland, 466 U.S. at 694).

"Because both prongs of Strickland present mixed questions of law and fact, this Court employs a mixed standard of review, deferring to the trial court's factual findings that are supported by competent, substantial evidence, but reviewing the trial court's legal conclusions de novo." Id.

"[T]he United States Supreme Court announced in Davis v. United States, 512 U.S. 452 (1994), that neither Miranda nor its progeny require police officers to stop interrogation when a suspect in custody, who has made a knowing and voluntary waiver of his or her Miranda rights, thereafter makes an equivocal or ambiguous request for counsel." State v. Owen, 696 So. 2d 715, 717 (Fla. 1997). In fact, "under Davis police are under no obligation to clarify a suspect's equivocal or ambiguous request and may continue the interrogation until the suspect makes a

clear assertion of the right to counsel." Id. And this Court has explained that "the reasoning of Davis applies when a defendant makes an equivocal assertion of any right under Miranda." Id. at 717-18. Accordingly, this Court has held that "police in Florida need not ask clarifying questions if a defendant who has received proper Miranda warnings makes only an equivocal or ambiguous request to terminate an interrogation after having validly waived his or her Miranda rights." Id. at 719.

Here, after Heyne waived his rights, the interrogating officer discussed possible scenarios or mental health issues that might mitigate Heyne's involvement in the murders. However, Heyne initially denied any involvement. Thereafter, the following questioning took place between the officer and Heyne:

> Q: So how are we going to handle this now - -
> A: I don't know. Put me in a jail cell.
> Q: - - after you being accused?
> A: I'll get a lawyer and we'll go through the court. And spend thousands and thousands of dollars on an innocent man. So that's how we're going to handle it. And if I'm convicted, and they convict me, then I do time and sit and let them fry me.

Heyne's statements were not "sufficiently clear[] that a reasonable police officer in the circumstances would understand the statement[s] to be a request for an attorney" or an assertion of the right to remain silent. Davis, 512 U.S. at 459. Instead, a reasonable officer could have concluded, as the trial court found, that Heyne "was merely predicting what would happen in the future if he were arrested for the murders." Therefore, because Heyne's statements were not unambiguous

and unequivocal assertions of his rights to counsel and silence, the officer was under no obligation to terminate questioning. See Walker v. State, 957 So. 2d 560, 574 (Fla. 2007) (holding that "I think I might want to talk to an attorney" as well as additional questions about an attorney were not an unequivocal request for counsel and did not require termination of questioning); Spivey v. State, 45 So. 3d 51, 54-55 (Fla. 1st DCA 2010) (holding that "I mean if I am being held and I'm being charged with something I need to be on the phone calling my lawyer" was at most a conditional request for counsel and not an unequivocal request requiring termination of interrogation).

Accordingly, because this Miranda claim is without merit, trial counsel cannot be deemed ineffective for failing to raise it.

## II.

Second, Heyne alleges that trial counsel was ineffective for failing to move to suppress the admission of the shoebox retrieved from Roxanne Larabie's attic as well as the box's contents. However, we affirm the denial of relief.

In Twiligar v. State, 42 So. 3d 177, 193 (Fla. 2010) (quoting State v. Milligan, 411 So. 2d 946, 947 (Fla. 4th DCA 1982)), this Court explained that, under Fourth Amendment law, "[n]o search occurs when police retrieve property voluntarily abandoned by a suspect in an area where the latter has no reasonable expectation of privacy." "The test for abandonment is whether a defendant

- 9 -

voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question so that he could no longer retain a reasonable expectation of privacy with regard to it at the time of the search." Id. (emphasis omitted) (quoting 14A Fla. Jur. 2d Abandoned Property § 633 (2001)).

Here, Heyne was not an occupant of, or even an invited guest in, Ms. Larabie's residence. Heyne had informed Ms. Larabie that he shot Ben and Sarah, that Ivory was gone, and that he had a gun with him in her residence. In response, Ms. Larabie told Heyne that he and his gun were unwelcome in her house. Knowing this, Heyne placed the gun in a shoebox (along with clothing that he wore during the crime) and voluntarily left the box behind in Ms. Larabie's attic. After Heyne departed, Ms. Larabie called the police and told them what had transpired. The officer obtained Ms. Larabie's consent to search her attic.

Under these circumstances, there was no illegal search and seizure of the box. Heyne relinquished his interest in the box by abandoning it in an area where he had no reasonable expectation of privacy. Heyne did not maintain a reasonable expectation of privacy with regard to the property left in the attic since Ms. Larabie specifically told him that she did not want the gun to remain at her residence. As the postconviction court explained, Heyne "would have known that there was a good chance that [Ms.] Larabie would try to get the box, or at least the gun which was inside the box, out of her house."

Accordingly, had trial counsel moved to suppress the box and its contents by alleging that the search was illegal, the request would have been denied as meritless.  See Fotopoulos v. State, 838 So. 2d 1122, 1131-32 (Fla. 2002) (affirming denial of claim that trial counsel was ineffective for failing to move to suppress two bags that were discovered during a search of the house of the defendant's mother-in-law that was conducted with the mother-in-law's consent even though the defendant was living in the home); see also State v. Kennon, 652 So. 2d 396, 399 (Fla. 2d DCA 1995) (holding that defendant abandoned any interest in pouch when she voluntarily chose to hide it under the tire of a vehicle in a vacant lot and walk away); State v. Daniels, 576 So. 2d 819, 824 (Fla. 4th DCA 1991) (holding that defendant abandoned her interest in the luggage when she voluntarily left "the suitcase in an area where she had no Fourth Amendment protection, the train station").  Counsel cannot be deemed ineffective for failing to raise a meritless argument.

## III.

Third, we consider whether Heyne is entitled to relief after the United States Supreme Court issued its decision in Hurst v. Florida, 136 S. Ct. 616 (2016). Because the jury recommended the death penalty by a vote of ten to two, we conclude that Heyne's death sentence violates Hurst.  See Kopsho v. State, 209 So.

3d 568, 570 (Fla. 2017). We must then consider whether the Hurst error was harmless beyond a reasonable doubt:

> The harmless error test, as set forth in Chapman[v. California, 386 U.S. 18 (1967),] and progeny, places the burden on the state, as the beneficiary of the error, to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction.

Hurst, 202 So. 3d at 68 (quoting State v. DiGuilio, 491 So. 2d 1129, 1138 (Fla. 1986)).

Because the jury in this case recommended death by a vote of ten to two, "we cannot determine that the jury unanimously found that the aggravators outweighed the mitigation." Kopsho, 209 So. 3d at 570. "We can only determine that the jury did not unanimously recommend a sentence of death." Id. Therefore, because we cannot say that there is no possibility that the error did not contribute to the sentence, the error in Heyne's sentencing was not harmless beyond a reasonable doubt.

Accordingly, we vacate the death sentence and remand for a new penalty phase. See Hurst, 202 So. 3d at 69.

## CONCLUSION

For the reasons stated above, this Court affirms the denial of the guilt phase claims raised in the initial postconviction motion filed pursuant to rule 3.851, but

we remand for a new penalty phase pursuant to Hurst.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, and QUINCE, JJ., concur.
POLSTON, J., concurs in part and dissents in part with an opinion, in which
CANADY and LAWSON, JJ., concur.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND
IF FILED, DETERMINED.

POLSTON, J., concurring in part and dissenting in part.

I concur with the majority's decision except its vacating of the death

sentence pursuant to Hurst.

CANADY and LAWSON, JJ., concur.

An Appeal from the Circuit Court in and for Brevard County,
        William David Dugan, Judge - Case No. 052006CF019237AXXXXX

James V. Viggiano, Capital Collateral Regional Counsel, and Chelsea Rae Shirley,
Maria E. DeLiberato, and Julissa Fontán, Assistant Capital Collateral Regional
Counsel, Middle Region, Temple Terrace, Florida,

        for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida; and Stacey E. Kircher,
Assistant Attorney General, Daytona Beach, Florida,

        for Appellee