679 So.2d 747 (1996)
Jermaine A. FOSTER, Appellant,
v.
STATE of Florida, Appellee.
No. 84228.
Supreme Court of Florida.
July 18, 1996.
Rehearing Denied September 6, 1996.
*750 James B. Gibson, Public Defender, and George D.E. Burden, Assistant Public Defender, Daytona Beach, Florida, for Appellant.
Robert A. Butterworth, Attorney General, and Margene A. Roper, Assistant Attorney General, Daytona Beach, Florida, for Appellee.
PER CURIAM.
We have on appeal the judgments and sentences of the trial court imposing two death sentences upon Jermaine A. Foster. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const.
The relevant facts adduced at trial are as follows. On the morning of November 28, 1993, Gerard Booker came to the trailer shared by Foster and Leondra Henderson and stated he wanted to recoup his recent gambling losses by committing robberies. The trio proceeded to Auburndale to a place called "The Hill." Armed with a .38 caliber handgun, a .9 millimeter handgun, and an Uzi-type automatic weapon, Foster and Booker, who were joined by Alf Catholic, approached three unknown men who were selling drugs from their truck. After forcing the victims to remove their clothing and lie on the ground, Foster, Catholic, and Booker stole the victims' cash, jewelry, crack cocaine, and red Ford pickup truck. Henderson then joined the group, and they concealed the stolen truck for future use.
Foster and Catholic returned to The Hill and sold some of the stolen drugs; however, the proceeds of the robbery were not sufficient to cover Booker's gambling losses. The group of Foster, Catholic, Booker, and Henderson agreed to find a local drug dealer and rob him. Then they retrieved the stolen red truck and loaded the guns from the earlier robbery into it. When the group was unable to locate their intended victim, they drove to Osceola County to visit a girlfriend of Catholic and to find other victims to rob.
At the girlfriend's house, the group decided to accompany the girlfriend and some of her friends to the Palms Bar in St. Cloud. Catholic and Foster rode in the car driven by Catholic's girlfriend, and Henderson and Booker followed in the stolen red truck. Both drivers stopped their vehicles in route to the bar, and Catholic's girlfriend bought some liquor. Testimony revealed that Foster and Catholic drank liquor and smoked marijuana during the trip. Then the two drivers pulled over so the girlfriend could buy some gas. It was determined at that time that there were problems with the truck's fan belt, which had caused the truck to overheat and smoke during the trip. Booker stated that they would have to steal another car in which to return home that night.
Once at the Palms Bar, Foster and Catholic drank liquor, and Foster played a video game and danced. After a while, the group went outside, and Booker detailed a plan to rob the entire bar. Foster told Booker the plan was "crazy" because it was unknown what "those boys got in there." As the group headed back into the bar, Henderson noticed a black Nissan Pathfinder that was in the parking lot. Henderson determined that Anthony Faiella and Mike Rentas had come to the bar in that vehicle. In fact, Faiella and Rentas came to the bar to meet Anthony Clifton, who was with Tammy George. Henderson pointed out Faiella, Rentas, and Clifton to Booker as possible victims to rob of their money and their vehicle. The group decided upon a plan to follow the potential victims when they left the bar in the Pathfinder. Foster told Henderson, Booker, and Catholic that if the victims did not have any money, he was going to kill them.
At around 1:30 a.m., Faiella, Rentas, Clifton, and George left the bar in the Pathfinder. The other group followed them in the red truck. Catholic was driving the truck and rammed into the back of the Pathfinder to get that vehicle to stop. When the victims stopped and got out of the Pathfinder to *751 inspect the damage, the group in the red truck took out their weapons and demanded money from the occupants of the Pathfinder. After the victims stated that they did not have any money, the victims were forced to return to the Pathfinder. Booker drove the Pathfinder, and Henderson held the victims at gunpoint from the passenger seat. The others followed in the red truck.
On the outskirts of Kissimmee, the red truck again began experiencing mechanical problems. Catholic turned off the main highway and drove a short distance into a vacant field; Booker and the victims followed in the Pathfinder. All four of the victims were ordered out of the Pathfinder, and Tammy George was separated from the three male victims. The group again demanded money from the male victims. When these victims did not produce any, they were ordered to remove their clothes, and Foster had the men place their underwear and hands on their heads and lie face down on the ground.
At this point, Foster, from a position beside and to the rear of Anthony Clifton, shot Clifton in the back of the head, killing him. Foster then approached Rentas and fired at his head. The bullet hit him in the hand, and Rentas pretended to be dead. Foster next walked to Faiella and shot him in the head, killing him. After this, Foster approached George as if to kill her, but Booker talked him out of it. The group then left in the Pathfinder and unsuccessfully tried to dispose of it by driving it into a lake. All four of the assailants were apprehended within days.
Foster was first tried in federal court on charges arising out of these acts. He was there convicted of conspiracy to commit armed carjacking, armed carjacking resulting in deaths, armed carjacking, and two counts of use of and carrying firearms during and in relation to a violent crime.
A state grand jury indicted Foster on two counts of first-degree murder, one count of attempted first-degree murder, and four counts of kidnapping.[1] After a jury trial, Foster was convicted of all counts in the indictment. A penalty-phase hearing was conducted, after which the jury unanimously recommended that Foster be sentenced to death on each of the two first-degree murder convictions. Finding four statutory aggravators[2] and one statutory mitigator,[3] the court followed this recommendation and sentenced Foster to death. On appeal, Foster raises twelve issues pertaining to both the guilt and penalty phases of his trial.[4] We will address *752 these claimed errors in the order in which they would have arisen during the proceedings.[5]

GUILT PHASE
First, we reject Foster's contention in issue 5 that the trial court erred in excusing a juror for cause over defense objection. The standard for determining whether a prospective juror may be excused for cause because of his or her views of the death penalty is whether the juror's views would prevent or substantially impair the performance of his or her duties as a juror in accordance with the juror's instructions and oath. Castro v. State, 644 So.2d 987, 989 (Fla.1994). It is within the trial court's province to determine if a challenge for cause is proper, and the trial court's determination of juror competency will not be overturned absent manifest error. See Mills v. State, 462 So.2d 1075, 1079 (Fla.), cert. denied, 473 U.S. 911, 105 S.Ct. 3538, 87 L.Ed.2d 661 (1985).
During voir dire, the prospective juror in question gave equivocal responses to questions from the State, the defense, and the court as to whether she could follow the law and set aside her belief that life in prison was always an appropriate sentence. In granting the State's motion to strike this juror for cause, the trial court stated:
I think what she's saying is if I don't have a choice, I'll impose the death penalty. But as long as I am in the weighing process here, I'm never going to impose the death penalty because there's always going to be life imprisonment. I'm going to grant the challenge for cause.
Based on our complete review of the voir dire of this juror, we do not find that the trial court abused its discretion in excusing this juror for cause.
Likewise, we reject Foster's contention in issue 7 that the trial court erred in failing to strike several other jurors for cause. We have thoroughly reviewed the voir dire in respect to these jurors and similarly find that there was no manifest error shown in the trial court's decisions. Accordingly, we find that this issue has no merit.
Next, we turn to issue 3: whether the trial court erred in denying Foster's motion for mistrial based on wrongful admission of hearsay evidence over Foster's objection. At trial, the State sought, under the coconspirator exception to the hearsay rule, to introduce hearsay statements made by the participants of the crimes. See § 90.803(18)(e), Fla. Stat. (1993). Prior to the admission of the hearsay, Foster challenged the existence of the conspiracy, and the trial court overruled the objection, stating that if the State did not tie the conspiracy together, then a mistrial would be appropriate. The trial court thereafter denied Foster's motion for mistrial at the end of the trial, finding that the State had carried its burden by presenting sufficient independent evidence of a conspiracy to admit the hearsay statements. On appeal, Foster asserts that the admission of hearsay statements by Booker and Catholic was improper because the State failed to establish the existence of the conspiracy by evidence independent of the hearsay statements. We do not agree.
Section 90.803(18)(e), Florida Statutes (1993), provides an exception to the general rule that hearsay statements are inadmissible as evidence. This section states:
[T]he following are not inadmissible as evidence, even though the declarant is available as a witness:
. . . .
(18) ADMISSIONS.A statement that is offered against a party and is:
. . . .
(e) A statement by a person who was a coconspirator of the party during the course, and in furtherance, of the conspiracy. Upon request of counsel, the court shall instruct the jury that the conspiracy itself and each member's participation in it must be established by independent evidence, either before the introduction of any evidence or before evidence is admitted under this paragraph.
*753 In determining the existence of a conspiracy, a court must rely upon evidence independent of the hearsay statements to prove the conspiracy before the coconspirator's hearsay statements are admissible. Romani v. State, 542 So.2d 984 (Fla.1989). The existence of a conspiracy must be proven by a preponderance of the evidence. Id. at 985 n. 3.
In this case, there is sufficient evidence, apart from any hearsay statements, of a conspiracy to rob and of participation by Foster, Booker, Henderson, and Catholic in the conspiracy. Henderson testified that Foster offered his sawed-off shotguns to Booker immediately prior to the first robbery. Commission of the Auburndale crimes by Foster, Booker, and Catholic is substantiated by testimony from three sources: Henderson, an eyewitness, and Foster's redacted confession. Henderson testified he drove the stolen red truck, following his accomplices to the orange grove where they then hid the truck. Additionally, there was testimony that the group continued the conspiracy by acts in furtherance of an attempt to rob another victim. The group loaded weapons into the red truck and searched together in the truck for their intended victim. As detailed above, after leaving the Palms Bar, there was evidence that the group acted in concert to rob the victims. Based on this nonhearsay, independent evidence, we find that the State established by a preponderance of the evidence the existence of a conspiracy to commit various criminal acts and participation in that conspiracy by Foster, Booker, Henderson, and Catholic. Accordingly, we find no merit to Foster's claim of error.
We find no merit in issue 4, in which Foster contends the trial court erred in admitting evidence of collateral crimes. Foster claims that admission of this evidence was error because the evidence's sole relevancy was to establish Foster's bad character or propensity to commit crimes. See Williams v. State, 110 So.2d 654 (Fla.), cert. denied, 361 U.S. 847, 80 S.Ct. 102, 4 L.Ed.2d 86 (1959); § 90.404, Fla.Stat. (1993).
Evidence of other crimes or acts is admissible if it is found to be relevant for any purpose, save that of showing bad character or propensity. See Williams, 110 So.2d at 662. Included in the permissible purposes for which collateral-crime evidence may be admitted is the establishment of the entire context out of which the criminal conduct arose. See Hunter v. State, 660 So.2d 244 (Fla.1995), cert. denied, ___ U.S. ___, 116 S.Ct. 946, 133 L.Ed.2d 871 (1996); Smith v. State, 365 So.2d 704 (Fla.1978), cert. denied, 444 U.S. 885, 100 S.Ct. 177, 62 L.Ed.2d 115 (1979).
The evidence here showed a continuing chain of chronological events, beginning with Booker's arrival at Foster's trailer and ending with Foster shooting and killing the two victims. See Malloy v. State, 382 So.2d 1190 (Fla.1979). Foster and his companions used the same guns in the murder as they had during the robbery of the drug dealers earlier that day, and also used the stolen truck to search out other victims and to ram the victims' vehicle in order to detain them. The use of the truck was integral to the entire criminal episode; thus, this evidence was clearly an inseparable part of the context surrounding the crimes for which Foster was charged. The State can present to the jury the complete picture of the criminal episode, and the evidence of the earlier crimes was admissible on this basis. See Hunter, 660 So.2d at 251; Charles W. Ehrhardt, Florida Evidence § 404.17 (1994). Additionally, this evidence is relevant to show Foster's motive and, ultimately, his intent. These robberies were all committed in an attempt to recoup Booker's gambling losses. Prior to leaving the Palms Bar, Foster stated that he would kill the victims if they did not have any money. Foster reiterated this reasoning after the killings. Consequently, we find no error.
Finally, we note that while Foster does not directly challenge the sufficiency of the evidence, we find that the record contains competent, substantial evidence to support Foster's convictions. We affirm Foster's convictions on all counts of the indictment.

SENTENCING PHASE
Foster only raises sentencing issues regarding the imposition of the death penalty *754 as a result of the first-degree murder convictions. Foster argues in issue 6 that the trial court erred in instructing the jury on the heinous, atrocious, or cruel aggravator. Foster contends that since the trial court did not ultimately find this aggravator, the fact that this instruction was given calls the jury's recommendation into question because the jury is presumed to have used this instruction and to have followed the law given to it by the trial judge.
Both this Court and the United States Supreme Court have reached the exact opposite conclusion. The United States Supreme Court has stated that a jury is unlikely to disregard a theory flawed in law, but it is likely to disregard an option simply unsupported by the evidence. See Sochor v. Florida, 504 U.S. 527, 538, 112 S.Ct. 2114, 2122, 119 L.Ed.2d 326 (1992). In Johnson v. Singletary, 612 So.2d 575, 577 (Fla.), cert. denied, 508 U.S. 901, 113 S.Ct. 2049, 123 L.Ed.2d 667 (1993), we stated that it is not error for a trial court to provide the jury with a proper instruction on the heinous, atrocious, or cruel aggravator even though that factor could not have existed as a matter of law. Consequently, contrary to Foster's contention, the jury was not presumed to have used this instruction in reaching its recommendation. Even if it was error, under the facts of this case we find that this error would be harmless as a matter of law. See State v. DiGuilio, 491 So.2d 1129 (Fla. 1986).
Also, Foster's claim in issue 8 that the trial court erred in finding that the murders were cold, calculated, and premeditated is without merit. We reject as procedurally barred Foster's claim that this aggravator is unconstitutionally vague because, first, it was not presented to the trial court. Second, we have consistently rejected similar attacks on this aggravator based upon vagueness. See Jackson v. State, 648 So.2d 85, 87 (Fla.1994); Fotopoulos v. State, 608 So.2d 784 (Fla.1992), cert. denied, 508 U.S. 924, 113 S.Ct. 2377, 124 L.Ed.2d 282 (1993).
As well, we reject Foster's claim that the State failed to show the heightened premeditation required for this aggravating circumstance. The trial court, in its sentencing order, found:
Defendant Foster announced two separate times his intention to kill the victims when he told Catholic and Henderson individually he intended to kill the victims if they had no money. These announcements were made before the Defendants left the Palms Bar and began tracking the victims. Before the murders occurred the robbery was complete in that the Defendants had the victims' automobile and all of their property. The victims had complied with all of the Defendants' orders and posed no physical threat to the Defendants. The victims were laying face down on the ground when Defendant Foster methodically executed each one.
We believe that the evidence in this record supports the finding of coldness, calculation, and heightened premeditation and the absence of moral or legal justification which we have required in order to find this aggravator. See Atwater v. State, 626 So.2d 1325 (Fla.1993), cert. denied, ___ U.S. ___, 114 S.Ct. 1578, 128 L.Ed.2d 221 (1994); Hall v. State, 614 So.2d 473 (Fla.), cert. denied, 510 U.S. 834, 114 S.Ct. 109, 126 L.Ed.2d 74 (1993).
We next consider Foster's issue 10, whether the trial court erred in considering separate aggravating circumstances that Foster committed the murders for pecuniary gain and during the commission of a felony (kidnapping). Foster argues that the trial court improperly doubled these aggravators because the indictment alleged that the underlying intent for the kidnappings was to commit a robbery. The indictment, however, also contained the alternative allegation that the kidnappings were done with the intent to terrorize. Foster argues that because there was no jury finding that this theory existed, the finding of both aggravators was improper.
Improper doubling occurs when aggravating factors refer to the same aspect of the crime. Provence v. State, 337 So.2d 783, 786 (Fla.1976), cert. denied, 431 U.S. 969, 97 S.Ct. 2929, 53 L.Ed.2d 1065 (1977). However, the evidence in this case supports a finding *755 of both aggravating circumstances. The purpose of the kidnappings clearly was not only to rob the victims. The evidence supports that the victims were robbed before they were kidnapped. Foster and his companions had already asked the victims for their money immediately after they hit the Pathfinder with the red truck. Moreover, at that point, Foster and his companions could have taken the victim's automobile without taking the victims. However, the victims were ordered back into their vehicle and driven away. Thus, it could be concluded beyond a reasonable doubt from the evidence that the kidnapping had a broader purpose than just to provide the opportunity to rob. See Green v. State, 641 So.2d 391 (Fla.1994), cert. denied, ___ U.S. ___, 115 S.Ct. 1120, 130 L.Ed.2d 1083 (1995). This claim is without merit.
In issue 2, Foster asserts that the trial court improperly balanced the aggravating factors against the mitigating factors. While we reject several of the claims appearing as subissues within this issue as without merit[6] and have already addressed others,[7] we address Foster's claim that the trial court failed to find the statutory mental mitigator of extreme mental or emotional disturbance and other nonstatutory mitigation. During the penalty phase, Foster presented expert testimony that he was under the influence of extreme mental or emotional disturbance and that his capacity to conform his conduct to the requirements of law was substantially impaired. Foster claims that since this expert testimony was uncontroverted, the trial court should have found this statutory mitigator. Additionally, Foster claims that the trial court should have found the nonstatutory mitigators that he came from an abused background; was mentally retarded; had a deprived childhood and poor upbringing; has organic brain damage; and is an alcoholic and was under the influence of alcohol at the time of the homicide.
The decision as to whether a mitigating circumstance has been established is within the trial court's discretion. Preston v. State, 607 So.2d 404 (Fla.1992), cert. denied, 507 U.S. 999, 113 S.Ct. 1619, 123 L.Ed.2d 178 (1993). Moreover, expert testimony alone does not require a finding of extreme mental or emotional disturbance. See Provenzano v. State, 497 So.2d 1177 (Fla.1986), cert. denied, 481 U.S. 1024, 107 S.Ct. 1912, 95 L.Ed.2d 518 (1987). Even uncontroverted opinion testimony can be rejected, especially when it is hard to reconcile with the other evidence presented in the case. See Wuornos v. State, 644 So.2d 1000, 1010 (Fla.1994), cert. denied, ___ U.S. ___, 115 S.Ct. 1705, 131 L.Ed.2d 566 (1995). As long as the court considered all of the evidence, the trial judge's determination of lack of mitigation will stand absent a palpable abuse of discretion. Provenzano, 497 So.2d at 1184.
In the sentencing order, the trial court found the following with regard to mitigating evidence:
The Court finds in mitigation the Defendant Foster suffered an abusive childhood. He was subject to physical and mental abuse, deprived of proper nurturing and guidance, and was repeatedly exposed to the physical abuse of his mother by her live-in boyfriend. He often failed to receive proper nutrition and clothing.
Expert testimony established that the Defendant suffers some organic brain damage, is mildly mentally retarded, and has a low IQ. Given the long duration and extent of his drug and alcohol use the Court concludes he suffers from a substance abuse problem and testimony showed he was to some extent under the influence of drugs and alcohol during the murders.
All of these mitigating factors lead this Court to find as a statutory mitigator that *756 the capacity of the Defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.
The Court finds no other statutory mitigators established. Specifically the Court does not find the murders were committed while the Defendant was under the influence of extreme mental or emotional disturbance as contended by the defense.
We conclude that the trial court considered all of the evidence presented, and it was not a palpable abuse of discretion for the trial court to refuse to find the statutory mitigator of extreme emotional disturbance. This mitigating circumstance has been defined as "less than insanity, but more emotion than the average man, however inflamed." Duncan v. State, 619 So.2d 279, 283 (Fla.), cert. denied, 510 U.S. 969, 114 S.Ct. 453, 126 L.Ed.2d 385 (1993), (quoting State v. Dixon, 283 So.2d 1, 10 (Fla.1973), cert. denied, 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295 (1974)). It is clear from the sentencing order that the trial court gave some weight to nonstatutory mitigation; however, the trial court did not find that it rose to the level of this statutory mitigator. Accordingly, we find that the trial court did not abuse its discretion in finding that this mitigator was not established.
We further note that the sentencing order shows that the trial court found and weighed the nonstatutory mitigating evidence that Foster contends should have been found. Deciding the weight given to a mitigating circumstance is within the discretion of the trial court, and a trial court's decision will not be reversed because an appellant reaches the opposite conclusion. See Dougan v. State, 595 So.2d 1 (Fla.), cert. denied, 506 U.S. 942, 113 S.Ct. 383, 121 L.Ed.2d 293 (1992). We find no reversible error.
Last, we turn to Foster's issue 1, whether his death sentences are proportionate. In reviewing a death sentence, this Court must consider the particular circumstances of the case on review in comparison to other decisions we have made and then decide if death is an appropriate penalty in comparison to those other decisions. Based on our review of the aggravating and mitigating circumstances present in this case as well as our case law, we conclude that death is a proportionate penalty as to both first-degree murders here. See Fennie v. State, 648 So.2d 95 (Fla.1994), cert. denied, ___ U.S. ___, 115 S.Ct. 1120, 130 L.Ed.2d 1083 (1995); Preston.
Accordingly, we affirm the convictions of guilt and the sentences of death.
It is so ordered.
KOGAN, C.J., and OVERTON, SHAW, GRIMES, HARDING, WELLS and ANSTEAD, JJ., concur.
NOTES
[1] Booker, Henderson, and Catholic were also indicted on these charges. Henderson pled guilty to two counts of first-degree murder and one count of attempted first-degree murder in exchange for his testimony in the state and federal trials. He was sentenced in state court to two concurrent life terms for the murder charges and fifteen years consecutive to that sentence for the attempted murder charge. Booker pled guilty on all counts and was not sentenced as of the end of Foster's trial. Catholic, who was tried in the same trial as Foster, was found guilty of all charges, and the jury recommended a life sentence.
[2] The trial court found the following aggravators: Foster was previously convicted of another capital felony; the capital felony was committed while the defendant was engaged in the commission of a kidnapping; the capital felony was committed for pecuniary gain; and the capital felony was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification. See § 921.141(5)(b), (d), (f), (i), Fla.Stat. (1993).
[3] The trial court found that Foster's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired. See § 921.141(6)(f), Fla.Stat. (1993).
[4] These issues are: (1) the death penalty is disproportionate; (2) the trial court improperly balanced the aggravators against the mitigators; (3) the trial court erred in denying defendant's motion for mistrial based on the wrongful admission of hearsay evidence over defense objection; (4) the trial court erred by allowing witnesses to testify about other crimes or bad acts; (5) the trial court erred in excusing a juror for cause over defense objection; (6) the trial court erred in instructing the jury that it could consider whether the murder was heinous, atrocious, or cruel; (7) the trial court erred in refusing to strike jurors for cause; (8) the trial court erred in finding that the murders were committed in a cold, calculated, and premeditated manner; (9) the trial court erred in overruling objections to the introduction of racial prejudice into the proceedings; (10) the trial court erred in considering separately that the murder was for pecuniary gain and that the murder occurred during the course of a kidnapping; (11) a new trial is warranted because of prosecutorial misconduct; and (12) section 921.141, Florida Statutes (1993), is unconstitutional.
[5] We find no merit in issues 9, 11, and 12, and reject these issues without discussion.
[6] We reject without discussion the claims that the jury's decision may have been influenced by the following inappropriate considerations: (1) inflamed emotions; (2) lack of remorse by virtue of Foster pleading not guilty; (3) premeditation as an aggravator; (4) alcoholism as an aggravator; and (5) drug abuse.
[7] For example, we have already rejected Foster's claims regarding: (1) the introduction of collateral crime evidence; (2) finding of the cold, calculated, and premeditated aggravator; and (3) the doubling of the pecuniary-gain aggravator with the kidnapping aggravator.