# Supreme Court of Florida

———

No. SC2022-0210

———

**THOMAS BEVEL,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

October 26, 2023

PER CURIAM.

Thomas Bevel appeals his two death sentences, which were imposed by the trial court for the second time following this Court's grant of postconviction relief and remand for a new penalty phase. *See Bevel v. State*, 221 So. 3d 1168, 1185 (Fla. 2017). We have jurisdiction. *See* art. V, § 3(b)(1), Fla. Const. For the reasons we explain, we affirm Bevel's death sentences.

## I. BACKGROUND

Bevel was convicted in 2005 of the first-degree murders of his friend and roommate, Garrick Stringfield, and Stringfield's thirteen-

year-old son, Phillip Sims, and the attempted murder of Feletta

Smith, whom Bevel and Stringfield knew from childhood. *Bevel v.*

*State*, 983 So. 2d 505, 513 (Fla. 2008). This Court summarized the

facts of Bevel's crimes in the original direct appeal as follows:

> Thomas Bevel, who was twenty-two years old at the time of the crime[s], resided with Garrick Stringfield, who was thirty. The two were close friends, such that Stringfield referred to Bevel as "nephew" or "Tom Tom" and Bevel referred to Stringfield as "Unc." On February 28, 2004, both men were at a street parade in Jacksonville where they ran into Feletta Smith, whom they both knew from their childhood. Smith exchanged telephone numbers with Stringfield and made plans to meet later that evening.
>
> After leaving the parade, Bevel and Stringfield purchased a bottle of gin and went back to Stringfield's house later in the evening. Because Stringfield was going out, he asked Bevel to wait for his thirteen-year-old son, Phillip Sims, who was being dropped off by his mother, Sojourner Parker. Although Parker noticed that Stringfield's car was not in the driveway when she arrived at the house, she was unconcerned because Bevel, a person she considered Stringfield's roommate, answered the door and let her son inside.
>
> Around 9 p.m., Stringfield met Smith at a Walgreens store and she followed him back to his house. When they arrived at Stringfield's house, Bevel and Sims were playing video games in the living room where Smith and Stringfield joined them. Although no illegal drugs were being consumed, Smith stated that Bevel and Stringfield were drinking gin out of the bottle and she had a half cup of gin and grapefruit juice. At some point, Smith and Stringfield went into his bedroom to watch television. Stringfield showed Smith an AK-47 rifle that he kept under his bed and, because Smith was scared of

- 2 -

it, he handed the gun to Bevel who removed it from the room. Stringfield and Smith remained in the bedroom with the door closed. Smith said that she last saw Sims playing video games in the living room.

Bevel then drove Stringfield's car to a BP gas station to meet his girlfriend, Rohnicka Dumas, took her to a bar where he purchased another bottle of gin, and brought her back to the house. When they returned, Stringfield and Bevel went into the backyard, Dumas went inside, Smith remained in Stringfield's bedroom, and Sims continued to play video games in the living room. Stringfield and Bevel then came back into the house and each had a gun in his possession; Stringfield was carrying a smaller handgun and Bevel had the AK-47 rifle that Stringfield had handed to him earlier in the evening. Bevel and Dumas went into the other bedroom, located across the hall from Stringfield's room, and talked.

Bevel then left the bedroom with the AK-47 rifle in his hand. He went to Stringfield's bedroom, where Smith and Stringfield were lying in bed nearly asleep, knocked on the door and said, "Unc, open the door." Stringfield got up from the bed, unarmed, and opened the door in his pajamas. Bevel immediately shot Stringfield in the head and he instantly fell to the floor in the doorway. Smith began screaming and Bevel yelled, "Bitch, shut up" while he shot her several times as she lay in the bed. Smith became quiet and pretended to be dead. She testified that there was "no doubt in [her] mind" that Bevel was the shooter. Rohnicka Dumas corroborated Smith's testimony. She observed Bevel pick up the rifle, go out into the hallway, knock on Stringfield's bedroom door and say, "Unc, look here." She testified that multiple shots were fired, during which she heard both the woman in the other room screaming and Bevel yell, "Bitch, shut up."

Bevel then went into the living room where Sims was still sitting on the sofa with the television remote in his hand and shot him twice, once grazing his arm and chest and once in the face. Subsequently, Bevel returned

- 3 -

to the bedroom where Dumas had been and they walked out the front door. Bevel locked the burglar bar door, a barred security gate located on the outside of the front door to the house, and drove away in Stringfield's car with Dumas sitting in the passenger seat. While driving to Dumas's house, Bevel held the AK-47 rifle under his chin and stated that he did not mean to kill the boy (Sims), but had to because he was going to be a witness. Bevel abandoned Stringfield's car near Dumas's house.

Smith was eventually able to reach 911 by using Stringfield's cell phone. Because Smith was unable to give the police an exact address, it took some time for the police and rescue to find the house. Ultimately, rescuers were able to transport her to the hospital where she stayed for almost a month while undergoing multiple surgeries for various gunshot wounds to her pelvis and upper legs.

After hiding for almost a month, Bevel was finally found by officers from the Jacksonville Sheriff's Office on March 27, 2004. Bevel was informed of his constitutional rights and indicated his understanding of each right by signing the rights form. The police questioned Bevel on two occasions over the course of twenty-four hours. During these two interviews, Bevel gave four different versions of the story but ultimately confessed to the murders.

Although Bevel confessed to murdering Stringfield and Sims, his version of events was contrary to the testimony of both Smith and Dumas. Bevel stated that he and Stringfield had been fighting recently about money that Stringfield believed he was owed and that Bevel feared that Stringfield was going to try and kill him. He said that when he brought Dumas back to the house that night, Stringfield began to get angry, saying that he should have killed Bevel a long time ago. While Dumas and Smith were in opposite bedrooms, the fight escalated until Stringfield was pointing the handgun at Bevel and Bevel had picked up the AK-47 rifle. Then, Stringfield went into his bedroom and, when Bevel heard a clicking

> noise that sounded like a magazine being loaded into the handgun, Bevel moved towards the room and shot Stringfield when he reached the door.  Bevel said the gun went off several times but he did not mean to shoot Smith.

*Id.* at 510-11 (second alteration in original).

In 2017, on appeal from the denial of his motion for postconviction relief, this Court reversed and remanded for a new penalty phase after concluding that counsel was ineffective during the penalty phase and that Bevel was entitled to relief under *Hurst v. State*, 202 So. 3d 40 (Fla. 2016), *receded from in part by State v. Poole*, 297 So. 3d 487 (Fla. 2020), for the death sentence imposed for Stringfield's murder.  *Bevel*, 221 So. 3d at 1172, 1177, 1185.

Both Bevel and the State presented witnesses at the second penalty phase.  Particularly relevant to this appeal, Bevel presented testimony from three expert witnesses: Steven Gold, Ph.D., a psychologist specializing in trauma; Robert Ouaou, Ph.D., a psychologist with a specialization in neuropsychology; and Geoffrey Negin, M.D., a diagnostic radiologist.  After hearing the evidence, the jury unanimously found that the proposed aggravators—prior violent felony (based on a prior attempted robbery conviction and the contemporaneous murder and attempted murder) as to both

murders and that the murder was committed for the purpose of avoiding arrest as to Sims's murder—were proven beyond a reasonable doubt and unanimously voted to sentence Bevel to death for each murder. None of the jurors found that any of the mitigating circumstances were established by the greater weight of the evidence. The trial court ultimately agreed with the jury that the aggravators were proven beyond a reasonable doubt and afforded each very great weight. As to the statutory mitigating circumstances, the trial court agreed with the jury that Bevel had not established that he committed the murders while under the influence of extreme mental or emotional disturbance[1] and that Bevel's age of twenty-two at the time of the offenses was not mitigating. As to the proposed other factors in Bevel's background that would mitigate against imposition of the death penalty under section 921.141(7)(h), Florida Statutes (2021), the trial court found

---

1. Although the trial court in its sentencing order and the parties in their briefing refer to this mitigator as being under the influence of extreme mental or emotional *distress*, the statute actually refers to extreme mental or emotional *disturbance*. This Court believes this to be an inadvertent scrivener's error and will use only the term "disturbance" in discussion of this mitigator.

as follows: IQ of seventy-one (little weight); Bevel's childhood was impacted by the trauma of his mother's death at age twelve (little weight); Bevel's father did not actively participate in his life and subsequently died due to heroin use (no weight); Bevel's childhood and teenage years were plagued by witnessing repeated acts of violence and substance abuse within his family (no weight); Bevel was essentially raised by his grandmother, who attempted to raise multiple grandchildren with very little financial or emotional resources (no weight); Bevel grew up in the eastern part of downtown Jacksonville, where drug selling, gunshots, violence, and substance abuse were common (no weight); Bevel was brought into the criminal lifestyle at a young age by his then criminal role models (no weight); Bevel was heavily influenced by the much older Garrick Stringfield (no weight); Bevel was shot multiple times in 2001 in front of his grandmother's house (no weight); Bevel, in spite of his traumatic childhood, has repeatedly shown the capacity for love and kindness (no weight); Bevel has exhibited good jail conduct as well as appropriate courtroom behavior (no weight); Bevel responds well in structured environments (no weight); Bevel confessed to his crimes and has shown immediate and repeated

remorse (not established/no weight); Bevel continues to impact the lives of his family members and has developed a nurturing, caring relationship with his daughter (no weight); Bevel suffers from brain damage which affects his decision making (little weight); Bevel was raised in a strong religious faith (no weight).

In sentencing Bevel to death, the court gave great weight to the jury's death recommendation and "wholly agree[d] with the jury's verdicts based on an assessment of the aggravating factors and mitigating circumstances presented and their respective weights." The court concluded that "the aggravating factors heavily outweigh[ed] the mitigating circumstances[] and that death is the only proper penalty for the murders." This appeal followed.

## II. ANALYSIS

Bevel raises five issues. First, Bevel argues that the trial court abused its discretion in disregarding the "unrefuted" expert testimony that he was under extreme mental and emotional disturbance at the time of the murders. In other words, he believes that the trial court erred in failing to find that he established the applicability of the statutory mitigating circumstance that "[t]he capital felony was committed while the defendant was under the

- 8 -

influence of extreme mental or emotional disturbance," section 921.141(7)(b), Florida Statutes, based on his diagnoses of post-traumatic stress disorder (PTSD) and depression. Bevel also asserts that the trial court's sentencing order improperly focused on causation and dismissed Bevel's personal and medical history as "self-reported" without acknowledging corroboration in the record.

Dr. Gold, a psychologist specializing in trauma, met with Bevel in 2014 and reviewed educational, medical, and legal records. Dr. Gold testified that Bevel suffered from depression and PTSD. During cross-examination, the following exchange occurred between the prosecutor and Dr. Gold:

> Q    So the bottom line is you did not interview [Bevel] or ask him what happened regarding both of these murders and attempted murder, correct?
>
> A    No, I did not.
>
> . . . .
>
> Q    [S]ince you didn't focus on interviewing the defendant regarding what happened, what I am trying to ask and making sure the record is clear is that you are not stating -- your opinion is not that he was under the influence of extreme mental or emotional disturbance, correct?
>
> A    He was under the influence of extreme mental or emotional disturbance. He had PTSD. He had depression.

Q     So you believe he -- at the time he committed these murders he was under the influence of extreme or emotional -- extreme mental or emotional disturbance?

A     I believe that throughout his life he was under the influence of extreme mental or emotional disturbance. That would include the time of the murders.

Q     So how can you make that assessment if you don't even ask him about the murders?

A     If someone is diagnosed with cancer and you were to ask me did the person have cancer when they committed the murders my answer would be, yes, cancer doesn't come and go.  PTSD doesn't come and go.  The type of major depression that Mr. Bevel has had since he was a child did not come and go.  He -- he had these diagnoses at the time of the murders.  What I am not saying is the diagnoses made him do it.

 . . . .

Q     So you are saying that when he shot this 13-year-old young boy he shot him because he was under the influence of extreme mental or emotional disturbance, correct?

A     You keep restating what I am telling you what I am not stating.  I am not saying he committed these offenses because he had these diagnoses.  Did these diagnos[e]s impair his functioning, yes.  Am I saying we can explain away the offense based on these diagnoses?  I am not. He was impaired at the time, yes.  There is a difference.

Q     Why do you say he was impaired at the time he committed both murders and the attempted murder?

A     Because you asked me was he impaired at that time.  He was impaired through most of his life from childhood.

- 10 -

Q    So he is impaired as he sits here today?

A    Yes.

Q    Okay.  So at any time there can be an outburst you are saying?

A    I am saying that any time somebody has cancer, if it hasn't resolved they have cancer.  Mr. Bevel -- Mr. Bevel's PTSD is very unlikely to have resolved without treatment.  His major depression is very unlikely to have resolved without treatment.  Within a reasonable degree of certainty as a professional I can say as he sits here he is impaired by PTSD and major depression.

The trial court's analysis and rejection of this mitigator spanned nearly four pages of the sentencing order and included a summary of the relevant law, a summary of the relevant testimony of the three experts on whom Bevel relied in his attempt to establish this mitigator, a recounting of Dr. Gold's diagnoses, and the numerous traumatic events in Bevel's life that he reported to Dr. Gold.

In ultimately rejecting the mitigator, the court concluded that "[a]though Dr. Gold opined that Defendant suffers from PTSD, no evidence exists that Defendant suffered from PTSD at the time of the murders or that the PTSD caused Defendant to commit the offenses while at that time suffering extreme mental or emotional distress [sic]."  The trial court noted that Dr. Gold did not discuss

the murders with Bevel, and that his evaluation of Bevel occurred approximately nine years after the murders.  The trial court also noted that Bevel engaged in purposeful, thoughtful, and deliberate conduct at the time of the murders, admitting that he killed Sims to eliminate him as a witness and securing the burglar bar on the door of the house after the murders in the hope of delaying discovery of the bodies.

We find no abuse of discretion in the trial court's rejection of this mitigator.  We have previously upheld the rejection of the extreme mental or emotional disturbance mitigator in cases where there was expert testimony, even uncontroverted expert testimony, of its existence.  For example, in *Foster v. State*, 679 So. 2d 747, 755 (Fla. 1996), Foster presented expert testimony that he was under the influence of extreme mental or emotional disturbance and argued on appeal that since this expert testimony was uncontroverted, the trial court should have found the statutory mitigator established.  In upholding the rejection of this mitigator, this Court wrote:

> The decision as to whether a mitigating circumstance has been established is within the trial court's discretion.  *Preston v. State*, 607 So. 2d 404 (Fla.

1992), *cert. denied*, 507 U.S. 999 (1993). Moreover, expert testimony alone does not require a finding of extreme mental or emotional disturbance. *See Provenzano v. State*, 497 So. 2d 1177 (Fla. 1986), *cert. denied*, 481 U.S. 1024 (1987). Even uncontroverted opinion testimony can be rejected, especially when it is hard to reconcile with the other evidence presented in the case. *See Wuornos v. State*, 644 So. 2d 1000, 1010 (Fla. 1994), *cert. denied*, 514 U.S. 1069 (1995). As long as the court considered all of the evidence, the trial judge's determination of lack of mitigation will stand absent a palpable abuse of discretion. *Provenzano*, 497 So. 2d at 1184.

679 So. 2d at 755. This Court found no error in *Foster* despite uncontroverted evidence of extreme mental or emotional disturbance because "the trial court considered all of the evidence presented, and it was not a palpable abuse of discretion for the trial court to refuse to find the statutory mitigator of extreme emotional disturbance." *Id.* at 756.

Here, the trial court also thoroughly considered the evidence presented. The only evidence that Bevel might have been under the influence of extreme mental or emotional disturbance at the time of the murders was Dr. Gold's testimony that because Bevel had begun suffering with depression and PTSD many years before the murders and because those conditions do not "come and go," he was, in Dr. Gold's opinion, "throughout his life . . . under the

- 13 -

influence of extreme mental or emotional disturbance," "includ[ing at] the time of the murders." But Dr. Gold did not explain why depression or PTSD might have caused "extreme mental or emotional disturbance" at the time of the murders. When asked what could have triggered a manifestation of PTSD at the time of the murders, Dr. Gold responded that he did not know because he did not assess Bevel about that. In sum, Dr. Gold's opinion that Bevel qualified for the extreme mental or emotional disturbance mitigator was based on the fact that he had diagnoses of depression and PTSD based on events that happened in his childhood and, as a result, he is "impaired" every moment of his life. Under Dr. Gold's theory, any capital defendant who had ever been diagnosed with depression or PTSD would qualify for this mitigator.

In *Nelson v. State*, 850 So. 2d 514, 529-30 (Fla. 2003), this Court discussed the rejection of uncontroverted expert testimony regarding the extreme mental or emotional disturbance mitigator:

> This Court has defined the circumstances under which a trial court may reject a mitigator:
> > Whenever a reasonable quantum of competent, uncontroverted evidence of mitigation has been presented, the trial court must find that the mitigating circumstance has been proved. A trial court may reject a

- 14 -

defendant's claim that a mitigating circumstance has been proved if the record contains competent substantial evidence to support the trial court's rejection of the mitigating circumstance.

*Spencer v. State*, 645 So. 2d 377, 385 (Fla. 1994) (citation omitted).

We considered the issue of expert opinion testimony in *Walls v. State*, 641 So. 2d 381 (Fla. 1994), stating:

Walls contends that the trial court improperly rejected expert opinion testimony that he was suffering extreme emotional disturbance and that his capacity to conform his conduct to the law's requirements was substantially impaired. In Florida as in many states, a distinction exists between factual evidence or testimony, and opinion testimony . . . .

. . . Certain kinds of opinion testimony clearly are admissible—and especially qualified expert opinion testimony—but they are not necessarily binding even if uncontroverted. Opinion testimony gains its greatest force to the degree it is supported by the facts at hand, and its weight diminishes to the degree such support is lacking. A debatable link between fact and opinion relevant to a mitigating factor usually means, at most, that a question exists for judge and jury to resolve.

*Id.* at 390-91 (citations omitted). Thus, the trial court was entitled to evaluate and disregard Dr. Dee's opinion if the trial court felt that the opinion was unsupported by facts. The testimony that Nelson was "seeing things" on the day of the murder, that he suffered from hallucinations, and that he suffered from depression for many years provided perhaps the most relevant evidence to support this mitigator. However, the record reflects that the source of this evidence was largely Nelson's self-

- 15 -

> reports to Dr. Dee, and that the trial court basically rejected Dr. Dee's uncontroverted expert opinion.

*Nelson*, 850 So. 2d at 529-30. Based on the witnesses' testimony that Nelson was acting normally before and after the murder, this Court concluded that "there was competent, substantial evidence refuting the allegation that Nelson was under extreme mental or emotional disturbance" and upheld the trial court's rejection of the mitigator. *Id.* at 530.

In *Nelson*, the evidence offered to support the extreme mental or emotional disturbance mitigator was that Nelson suffered from depression for many years and he told his mental health expert that he was "seeing things" on the day of the murder and that he suffered from hallucinations. *Id.* And this evidence was controverted by witnesses who testified that Nelson was acting normally before and after the murders. *Id.*

Here, Dr. Gold's opinion that Bevel qualified for the extreme mental or emotional disturbance mitigator was based solely on Bevel's longstanding diagnoses of depression and PTSD, but Dr. Gold's opinion is difficult to reconcile with the fact that he did not discuss the murders with Bevel or assess his mental or emotional

state at the time of the murders, and that Bevel—as described in his confession—engaged in purposeful conduct at the time of the murders, including killing Sims to eliminate him as a witness and securing the burglar bar on the door of Stringfield's house after the murders. Further, although Dr. Gold did testify when asked directly that Bevel was under the influence of extreme mental or emotional disturbance at the time of the murders, Dr. Gold also testified several times that Bevel was simply "impaired" at all times, including the time of the murders, by his depression and PTSD. But mere "impairment" cannot be equated with the "extreme disturbance" required to establish the mitigator; thus, Dr. Gold's opinion as to the extent that the depression and PTSD affected Bevel's baseline mental or emotional state and therefore his mental or emotional state at the time of the murders is not entirely clear.

Under the circumstances before us, there is competent, substantial evidence in the record to support the rejection of this mitigator. Moreover, the trial court did consider all of the evidence, and its determination—which reflected the same conclusion reached by the jury—that the extreme mental or emotional disturbance mitigator was not established by the greater weight of

- 17 -

the evidence will "stand absent a palpable abuse of discretion," *Foster*, 679 So. 2d at 755 (quoting *Provenzano*, 497 So. 2d at 1184), which is simply not present here.

As to Bevel's complaint that the resentencing order improperly focused on causation, we disagree. The trial court simply accurately noted that "Dr. Gold emphasized during his testimony that Defendant's PTSD did not cause him to commit the offenses but increased the likelihood Defendant would engage in criminal behavior." And as to his complaint that the trial court dismissed Bevel's personal and medical history as "self-reported" without acknowledging corroboration in the record, even assuming that the trial court did overlook corroboration in the record, any corroboration of Bevel's personal and medical history would not have undermined the trial court's conclusion that this mitigator was not established by the greater weight of the evidence that Bevel was under extreme mental or emotional disturbance at the time of the murders. Dr. Gold did not testify that he reviewed any records pertaining to Bevel's mental state at the time of the murders.

Finally, even if we were to conclude that the trial court erred in rejecting this mitigator, we would find any error harmless. In light

of the fact that the mitigation that was established was not extensive or weighty, even if the trial court had found this mitigator established and afforded it greater weight than any other mitigator, the additional mitigation that this circumstance would have provided would not have tipped the scale such that the mitigation would have outweighed the aggravation, requiring the imposition of life sentences for the murders.

Bevel next argues that the trial court erred in denying his requests that the jury be instructed that regardless of its findings regarding the aggravators and mitigators, it may always consider mercy in determining whether Bevel should be sentenced to death. The trial court denied these requests for special instructions and instead read Florida Standard Jury Instruction (Criminal) 7.11, informing jurors that "[r]egardless of the results of each juror's individual weighing process—even if you find that the sufficient aggravators outweigh the mitigators—the law neither compels nor requires you to determine that the defendant should be sentenced to death."

"A trial court's denial of special jury instructions is reviewed for abuse of discretion." *Snelgrove v. State*, 107 So. 3d 242, 255

(Fla. 2012). Here, the trial court did not abuse its discretion in denying Bevel's requested special instructions. We have repeatedly determined that Standard Jury Instruction 7.11 adequately informs jurors of the applicable legal standard. *E.g., Woodbury v. State*, 320 So. 3d 631, 656 (Fla. 2021), *cert. denied*, 142 S. Ct. 1135 (2022); *Bush v. State*, 295 So. 3d 179, 210 (Fla. 2020). We have even referred to the relevant provision in this instruction as the "mercy instruction." *See Woodbury*, 320 So. 3d at 656 (quoting *Reynolds v. State*, 251 So. 3d 811, 816 n.5 (Fla. 2018)). "Thus, the court *did* read an instruction on mercy, and although [the defendant] might have preferred the wording of his proposed instruction, Standard Jury Instruction 7.11 is not ambiguous when it comes to addressing the jurors' options." *Id.* Bevel is not entitled to relief on this claim.

Bevel also argues that the trial court erred in precluding any argument to the jury about the proportionality of his possible sentence. The trial court did not err in its ruling. "The jury's responsibility in the process is to make recommendations based on the circumstances of the offense and the character and background of the defendant." *Herring v. State*, 446 So. 2d 1049, 1056 (Fla.

1984), *receded from on other grounds by Rogers v. State*, 511 So. 2d 526, 533 (Fla. 1987).  It is not to compare the facts of the case before it to the facts of other cases or to compare the aggravation and mitigation applicable to the defendant before it to the aggravation and mitigation applicable to other defendants.

Bevel's remaining arguments are similarly without merit. Bevel acknowledges that his argument that the jury's determination regarding the sufficiency and weight of aggravating factors should be subject to proof beyond a reasonable doubt is contrary to precedent from this Court and states that this issue is being raised only to preserve it for federal review.  Bevel is correct that we have repeatedly reaffirmed our conclusion that determinations regarding the sufficiency and relative weight of the proven aggravators are not subject to proof beyond a reasonable doubt.  *E.g.*, *McKenzie v. State*, 333 So. 3d 1098, 1105 (Fla.), *cert. denied*, 143 S. Ct. 230 (2022); *Joseph v. State*, 336 So. 3d 218, 227 (Fla.), *cert. denied*, 143 S. Ct. 183 (2022); *Davidson v. State*, 323 So. 3d 1241, 1247-48 (Fla. 2021), *cert. denied*, 142 S. Ct. 1152 (2022).  As to his argument that Florida's capital sentencing scheme is unconstitutional because it does not limit the class of persons eligible for the death penalty and

violates the Eighth Amendment due to the elimination of comparative proportionality review in *Lawrence v. State*, 308 So. 3d 544, 549 (Fla. 2020), and an overprovision of aggravating factors, we have consistently rejected similar arguments, *e.g.*, *Joseph*, 336 So. 3d at 227 n.5 (declining to address claim that Florida's death penalty statute is unconstitutional because it does not sufficiently narrow the class of individuals eligible to receive the death penalty on the ground that this Court has repeatedly rejected the same argument); *Covington v. State*, 348 So. 3d 456, 480 (Fla. 2022) (rejecting claim that elimination of proportionality review in *Lawrence* rendered Florida's capital sentencing scheme unconstitutional); *Colley v. State*, 310 So. 3d 2, 15-16 (Fla. 2020) (rejecting claim that Florida's capital sentencing scheme is unconstitutional because the number of aggravating factors does not sufficiently narrow the class of individuals who are eligible to receive the death penalty), and Bevel makes no novel or compelling argument that would warrant reconsideration of the numerous recent decisions of this Court.

## III. CONCLUSION

Having concluded that none of Bevel's claims warrant relief from his death sentences, we affirm.

It is so ordered.

MUÑIZ, C.J., and CANADY, COURIEL, GROSSHANS, and FRANCIS, JJ., concur.
LABARGA, J., concurs in result with an opinion.
SASSO, J., did not participate.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

LABARGA, J., concurring in result.

Because I continue to adhere to my dissent in *Lawrence v. State*, 308 So. 3d 544 (Fla. 2020), wherein this Court abandoned this Court's decades-long practice of comparative proportionality review in the direct appeals of sentences of death, I can only concur in the result.

An Appeal from the Circuit Court in and for Duval County,
    Adrian G. Soud, Judge
    Case No. 162004CF004525AXXXMA

Jessica J. Yeary, Public Defender, and Barbara J. Busharis, Assistant Public Defender, Second Judicial Circuit, Tallahassee, Florida,

    for Appellant

Ashley Moody, Attorney General, Tallahassee, Florida, and Doris Meacham, Senior Assistant Attorney General, Daytona Beach, Florida,

for Appellee